**OSCAR L. ARONSEN, INC., Plaintiff,**

**v.**

**Norman Philip COMPTON et al.,
Defendants.**

**No 68 Civ. 904.**

United States District Court,
S. D. New York.

July 19, 1973.

Haight, Gardner, Poor & Havens, New York City, for plaintiff; by Charles S. Haight, Jr., New York City.

Mendes & Mount, New York City, for defendants; by Brendan J. Connolly, New York City.

### MEMORANDUM OF DECISION

LUMBARD,* Circuit Judge:

Oscar L. Aronsen, Inc. sues to recover $250,000 on two policies of marine insurance. Aronsen, a New York corporation, was the charterer of the vessel M/V Megara which was stranded, with cargo on board, in the Sulu Sea on August 17, 1966. Defendants represent the

* Sitting by designation.

London insurance underwriters that wrote the two anticipated charter profits policies on which plaintiff seeks to recover. The only issue is whether the settlement agreement between the owner of the M/V Megara and the underwriters on the hull and machinery policies involved an "arranged" or "compromised" total loss. If it did, then plaintiff is entitled to recover.[1]

## I

The two anticipated charter profits policies at issue covered the expected charter profits of the M/V Megara for one year from 11:00 P.M. on August 9, 1966 to 11:00 P.M. on August 9, 1967. Under such policies the charterer of a vessel is insured against the loss of the profits that he anticipates realizing from use of the vessel during the insured period. The underwriters accept the face amount of the policies, in this case $250,000, as being the charterer's anticipated profits, and if a claim is made, no proof is required of the actual charter profits lost.

One policy issued by Lloyd's of London covered 84.4 per cent of the total $250,000 risk; the remaining 15.6 per cent was covered by a policy of the Institute of London Underwriters Companies. Defendant Norman Philip Compton appears individually and as repre-

sentative of the underwriters on the Lloyd's policy, while defendant Eagle Star Insurance Co., Ltd. appears individually and as representative of the underwriters on the Institute of London Underwriters Companies policy.

These anticipated charter profit policies do not insure against partial loss of the vessel, but they do cover, among other things, "total or constructive total or compromised or arranged total loss of vessel only caused by or arising from perils under the American Institute Time (Hulls) January 1, 1964 Form."[2] The policies also contain the following clause:

> It is understood and agreed that if the policies on Hull and Machinery contain provisions with respect to the method of ascertaining whether the vessel is a constructive total loss similar to or having the same effect as the American Institute Time (Hulls) January 1, 1964 Form, the settlement of a claim for total or constructive total loss under the Hull and Machinery policies shall be accepted as proof of the total loss of the vessel under this policy.

Hull and machinery policies are insurance policies taken out by the owner of a vessel to insure against damage to the hull and machinery. The parties are

---

1. This case falls within the admiralty and maritime jurisdiction of the federal courts. 28 U.S.C. § 1333. Personal jurisdiction over defendants exists by consent. The anticipated charter profits policies both contain a clause stating that "the place of suit hereon shall be deemed the State of New York, United States of America and any suit hereon may be brought against Underwriters in any Court of competent jurisdiction within the United States." The policies go on to state that service of summons and other legal process may be made by mailing copies thereof to certain named partners of defendants' law firm.

2. At the deposition of Richard Rutherford, Adjuster of Claims and Manager, Lloyd's Underwriters' Claims Office, which was introduced at trial, Rutherford stated that
    "[a] total loss means an actual total loss, in my view, and that means to say that if the vessel is so totally destroyed as to be

not a thing which would be considered to be a vessel, then we have a total loss."
Rutherford also discussed in broad terms the meaning of the phrase "constructive total loss." He stated that a
    "constructive total loss . . . is a total loss which arises because the cost of recovery and repair of the vessel would exceed her value when recovered and repaired . . . [or a] constructive total loss might also arise if the owner is deprived of his vessel and it is unlikely that he can recover her within . . . a reasonable time."
This definition is only for general purposes; the term "total constructive loss" is precisely defined in the insurance policies involved in this litigation. As for the meaning of the terms "compromised total loss" and "arranged total loss," their definitions become central to the resolution of the dispute before the court and are discussed fully in text below.

agreed that the owner of the M/V Megara[3] did have hull and machinery policies with provisions for "ascertaining whether the vessel is a constructive total loss . . . having the same effect as the American Institute Time (Hulls) January 1, 1964 Form." That form provides in pertinent part:

> No recovery for a Constructive Total Loss shall be had hereunder unless the expense of recovering and repairing the Vessel shall exceed the insured value.

> In ascertaining whether the Vessel is a Constructive Total Loss the insured value shall be taken as the repaired value, and nothing in respect of the damaged or break-up value of the Vessel or wreck shall be taken into account.

Thus, the anticipated charter profits policies provide coverage in the event of (1) a total loss, (2) a constructive total loss, (3) a compromised total loss, or (4) an arranged total loss. They also provide, in effect, that if there is a settlement of a claim made by the owner under the hull and machinery policies which falls into one of the above four categories, that settlement will be taken as proof of total loss of the vessel under the anticipated charter profits policies. After the stranding of the M/V Megara the owner did make a claim under the hull and machinery policies for the constructive total loss of the vessel. Aronsen asserts that the owner's claim was compromised or arranged and that it is therefore entitled to recover the full amount of the anticipated charter profits policies. Consequently, we look to what transpired between the owner of the M/V Megara and the underwriters on the hull and machinery policies to determine defendants' liability under the anticipated charter profits policies.

**II**

The only testimony introduced at trial was plaintiff's deposition of Richard Rutherford, Adjuster of Claims and Manager, Lloyd's Underwriters' Claims Office. According to Rutherford the M/V Megara was stranded on Bancoran Island in the Sulu Sea on August 17, 1966. Plaintiff's anticipated charter profits policies were in full force at this date and the stranding resulted from a cause covered by plaintiff's policies. The vessel was eventually refloated under contract salvage and was towed to Manila for survey of damage and transshipment of cargo. Both the shipowner and the underwriters sent representatives to estimate the cost of repairing the M/V Megara.

Under the hull and machinery policies[4] a total constructive loss occurs only if the "expense of recovering and repairing the Vessel" exceeds its insured value. The insured value of the M/V Megara was £ 140,000. The shipowner's marine superintendent, a Mr. N. Soutos, estimated the cost of repairs at £ 122,500. Certain additional items, which are lumped under the categories of particular and general average expenses, also come within the definition of repair and recovery in determining if a total constructive loss has occurred. These expenses were estimated by Richard Arnold & Son, the owner's average adjusters, to total £ 20,039. Thus, the shipowner's estimated total cost of repair and recovery came to £ 142,539, which was £ 2,539 more than the insured value.

The shipowner, promptly after receipt of this estimate, notified the underwriters that he was claiming a total constructive loss under the hull and machinery policies. The shipowner also sent a written notice of abandonment, dated February 11, 1967,[5] as is the practice

---

3. The M/V Megara was owned by Acres Shipping Co. of Piraeus, Greece.

4. As with the anticipated charter profits policies, there were two hull and machinery policies, which together covered the total risk.

5. A "notice of abandonment," as its name implies, signifies that the owner abandons all title and interest in the vessel and tenders what remains of the insured property to the underwriters. Couch on Insurance 2d §§ 55 :180, 55 :201.

when claiming a constructive total loss. As the underwriters' representative had estimated that the cost of repairs, if they were done in a Japanese repair yard, would only be £79,300, the underwriters declined the notice of abandonment on the ground that the M/V Megara was not a total constructive loss.

Following the usual practice in such disputes, the underwriters did "agree the writ clause," an English practice that permits the rights and responsibilities of the parties to become fixed as of the date of the notice of abandonment rather than at the date suit is brought, as it would otherwise be. See II J. Arnould, British Shipping Laws §§ 1089–92 (15th ed. 1961). Thus, even if a suit were instituted at a later date by the owner, the question would be whether the M/V Megara was a constructive total loss at the date of the notice of abandonment not at the date the suit was actually commenced.

Negotiations took place in London during February 1967 between the shipowner's adjuster, Richard Arnold & Son, and Richard Rutherford, who represented the hull underwriters. The shipowner initially put forward a claim for either a constructive total loss or, in the alternative, a partial loss, and requested an immediate payment of £60,000 on account, since the vessel had in any event sustained an injury of at least that amount. The hull underwriters refused to make the requested payment. They took the position that the owner had failed adequately to substantiate the claim for constructive total loss, and they refused to consider the claim on a partial loss basis so long as the owner persisted in claiming a constructive total loss. Rutherford, on behalf of the underwriters, made it clear that they would steadfastly resist the owner's claim of a constructive total loss, even to the point of litigation. Rutherford informed the owner's representative that if, however, the owner were willing to withdraw the claim for a constructive total loss, the underwriters would be willing to consider settling on a partial loss basis.

Thereafter, the owner did agree to withdraw its notice of abandonment and its claim for a total constructive loss. The owner's claim on the hull policies was finally settled as a partial loss in accordance with principles set out in the Marine Insurance Act of 1906, with a payment for unrepaired damage in the amount of £83,000, including £79,300, the estimated cost of Japanese repairs, plus £3,700 for towage to a Japanese repair port. Under the terms of the settlement the underwriters were also obligated to pay particular average expenses charged to the owner and the vessel's share of general average expenses, which came to £25,625. The shipowner also retained title to the vessel, which was ultimately sold for scrap. The owner retained the net proceeds of the sale which amounted to £46,880.

### III

Aronsen maintains that what occurred between the owner and the hull underwriters involved a compromised or arranged total loss within the meaning of the anticipated charter profits policies. The vessel was badly damaged and the owner put forward a claim for constructive total loss as well as a claim for partial loss. The owner submitted estimates which, if proven, would have sustained his claim for constructive total loss. After negotiations between the parties, the owner withdrew its claim for constructive total loss and the underwriters agreed to the payment of substantial sums on the owner's claim for unrepaired damage. This, says Aronsen, is a compromised or arranged total loss. The defendants counter that the owner's claim was settled solely as a claim for partial loss and that plaintiff has failed to introduce any evidence that what occurred constituted a compromised or arranged total loss.

There do not appear to be clear, definite, and precise definitions of the meaning in marine insurance parlance of

the terms "compromised total loss" and "arranged total loss."[6] The witness Rutherford offered some general observations to the effect that "[a] compromise means what it says; that is to say, there are elements in the loss which appertain to one party or the other party, and for the sake of speedy, reasonable settlement short of litigation one may compromise certain issues." Rutherford also stated that "arranged total loss is seldom seen these days, and very often comes to much the same sort of thing" as a compromised total loss. Despite the absence of a more precise definition, it is clear that plaintiff has failed to introduce sufficient evidence to demonstrate that the hull underwriters and the owner of the M/V Megara compromised or arranged a constructive total loss.

The final settlement between the owner of the M/V Megara and the hull underwriters was entirely on the basis of a partial loss with payment for unrepaired damage. According to Richard Rutherford, the settlement was worked out by comparing the depreciation on the insured value of the vessel with the reasonable cost of repairs and taking the lesser of the two as the settlement figure. Since the cost of repairs, which was estimated to be £83,000 (£79,300 representing the estimated cost of repairs and £3,700 representing the estimated cost of towing the vessel to the repair port), was somewhat less than the depreciated value, payment was made on a repair cost basis. The underwriters remained liable for further general average and particular average claims, and continued to insure the vessel at a reduced value reflecting the unrepaired damage. These terms and the method by which they were arrived at are fully in accordance with a settlement on a partial loss basis under English marine insurance practice as embodied in the Marine Insurance Act of 1906. The owner specifically agreed to settlement on a partial loss basis and actually withdrew his notice of abandonment and claim for constructive total loss prior to settlement.

Despite these facts, Aronsen claims that the settlement constituted a compromised or arranged total loss within the meaning of the anticipated charter profits policies. Reduced to its essentials, plaintiff's position is that whenever an owner puts forward a claim for a constructive total loss in combination with a claim for a partial loss and submits figures which, if proven, would substantiate a constructive total loss, then a compromised or arranged constructive total loss occurs if during the course of negotiations the owner's claim for a constructive total loss is abandoned and a settlement for a substantial sum of money is reached between the parties. It seems to the court that more is needed than the submission by the shipowner of bare, unsubstantiated figures in support of a claim for a constructive total loss to make any subsequent settlement a bona fide compromise or arrangement of a good faith claim for a constructive total loss. Here the only figure mentioned by the owner was an estimate of his employee. According to Rutherford's uncontradicted testimony, the owner had not sought bids or tenders to support his estimate of repair costs. Thus the owner's repair cost claim gives every appearance of a figure arrived at in order to exceed the insured value when added to other expenses. Surely, it cannot be that whenever a shipowner whose vessel has been partially damaged submits inflated repair estimates and a claim for a constructive total loss along with his claim for a partial loss, that a compromised constructive total loss occurs upon settlement of the claim. Such a result would be absurd when, as seems to have been the case here, the submission of the constructive total loss claim by the shipowner was merely a device to bolster his

---

6. The parties have cited only English cases and apparently assume that the definition of these terms is governed solely by English marine usage. Since the parties have not indicated that American courts would define these terms differently, no problem is presented as to which law governs.

bargaining position with the hull underwriters and inflate his recovery for the damage to his vessel. As Rutherford's testimony makes clear, this type of bargaining process is necessarily a part of attempting to collect on a marine insurance policy.

Plaintiff called no witnesses of its own, but only introduced the deposition of Richard Rutherford, who represented the hull underwriters in their negotiations with the owner of the M/V Megara. Rutherford testified clearly that the hull underwriters did not believe that the owner's repair estimate could be substantiated and that the underwriters were unwilling even to discuss settlement *on any basis* until the owner withdrew its notice of abandonment and claim for a constructive total loss. The owner did so, and a settlement was reached strictly in accordance with the underwriters' estimates for repair costs plus towage to a Japanese repair port. Thus it is clear that the settlement was reached on a partial loss basis and not as a compromise of a claim of constructive total loss.

No representative of the owner was called to testify as to the owner's understanding of the negotiations or the reasonableness of the views expressed by Rutherford in his deposition. No evidence was adduced by plaintiff as to what the actual costs of repairing the M/V Megara might have been. Thus, plaintiff has failed to impeach Rutherford's evidence of the nature of the settlement between the owner of the M/V Megara and the hull underwriters or to prove that the M/V Megara was in fact at least arguably a constructive total loss.

Plaintiff does rely on a group of English cases involving hull reinsurance, principally Street v. Royal Exchange As-

surance, 18 Com.Cas. 284, aff'd 19 Com. Cas. 339 (C.A.1914), in support of its theory that the settlement of the shipowner's claim constituted a compromised total loss. In *Street* the shipowner commenced suit against the hull underwriters to recover for the constructive total loss of his vessel. The underwriters thereupon agreed to a settlement for somewhat less than the insured value of the vessel. The settlement agreement itself did not specify whether the claim was settled on a total loss or a partial loss basis. The hull underwriters then claimed against the reinsurers, asserting that a compromised total loss had occurred. The Court of Appeal held that a compromised total loss had occurred. *Street* is clearly distinguishable from the present case. Unlike the owner of the M/V Megara, the shipowner in *Street* pressed his claim for a constructive total loss to the point of instituting suit.[7] Furthermore, the settlement agreement did not specify whether the claim was being settled on the basis of a constructive total loss of the vessel or a partial loss of the vessel. The Court of Appeal was left with no alternative, therefore, but to hold that the underwriter had compromised the shipowner's claim for a constructive total loss.

Plaintiff also suggests that there was a partial identity of interest between the underwriters on the hull and machinery policies and the underwriters on the anticipated charter profits policies because a certain number of underwriters participated in both sets of policies. Plaintiff asserts that this may have influenced the characterization of the final settlement between the shipowner and the hull underwriters. It seems that it is the nature of the London insurance market that several underwriters come together to share the risk on a particular policy. Since different underwriters

7. Plaintiff insists that when the defendants agreed the writ clause they put plaintiff in the same position as if it had started suit. Agreeing the writ clause does not have quite the meaning plaintiff attaches to it. It is merely a device for assuring that the ques-

tion of whether the vessel was a constructive total loss will be tested as of the time that the notice of abandonment was given rather than at the time that suit is commenced. See p. 424 *supra*.

join with one another on different policies, some overlapping of underwriters appears to be almost inevitable. However, this fact is not likely to have had a significant impact on the settlement negotiations between the hull underwriters and the owner of the M/V Megara. In the first place, Rutherford, who represented the underwriters in the negotiations with the shipowner, testified that he was unaware of the existence of the anticipated charter profits policies at the time that settlement of the shipowner's claims was being discussed. Secondly, Rutherford testified that in conducting his professional affairs he must act "in the utmost good faith" and that his dealings must "be beyond reproach." This is a credible assertion because Rutherford in his position as chief claims adjuster at Lloyd's represents many different underwriters. It is the nature of the London market that "[u]nderwriters . . . may be original insurers to-day and reinsurers to-morrow." Gurney v. Grimmer, 38 Com.Cas. 7 (C.A.1932). When an underwriter acts as an original insurer his interests are quite different than when he acts as a reinsurer. Since Rutherford's office represents the underwriters in both capacities, he and the other members of his staff must of necessity deal objectively and fairly in settling claims. In addition, a total loss only reinsurer, when settling a claim by the original insurer, often follows the settlement reached by the original insurer with the shipowner. Here, too, the fairness of the original settlement is paramount.

The plaintiff has not demonstrated that a compromised or arranged total loss took place between the underwriters on the hull and machinery policies and the owner of the M/V Megara. It has therefore failed to prove that there was a "total or constructive total or compromised or arranged total loss of the vessel" within the meaning of the anticipated charter profits policies. Accordingly, judgment will be entered dismissing the complaint, with costs to the defendants.

This opinion constitutes the findings of fact and conclusions of law required by Rule 52 Federal Rules of Civil Procedure.