OSCAR L. ARONSEN, INC.,
Plaintiff-Appellant,

v.

Norman Philip COMPTON, et al.,
Defendants-Appellees.

No. 748, Docket 73–2209.

United States Court of Appeals,
Second Circuit.

Argued March 28, 1974.

Decided April 9, 1974.

Charles S. Haight, Jr., New York City (Haight, Gardner, Poor & Havens, New York City, on the brief), for plaintiff-appellant.

Brendan J. Connolly, New York City (Mendes & Mount, New York City, on the brief), for defendants-appellees.

Before KAUFMAN, Chief Judge, SMITH and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

A phrase may be clear and unambiguous in one setting; fuzzy and imprecise in another. "Words," Justice Holmes once said, "[are like] the skin of a living thought and may vary greatly in color and content according to the circum-

stances and time in which . . . [they are] used." Towne v. Eisner, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). In this instance, the factual context clarifies, not beclouds, the language of a marine insurance policy we are called upon to interpret. Accordingly, we have little difficulty in affirming the sound construction of the terms of policy coverage adopted by the court below.

Oscar L. Aronsen, Inc. (Aronsen) was charterer of the vessel M/V Megara, which was stranded, with cargo on board, in the Sulu Sea on August 17, 1966. The ship was refloated and towed to Manila for survey of damages and trans-shipment of cargo. The owner, Acres Shipping Co., declined, however, to repair the vessel and it was eventually sold for scrap.

On June 2, 1967, Aronsen submitted a claim for $250,000, the face amount of his two Anticipated Charter Profit policies,[1] to the marine insurance underwriters in London. Payment was declined on the ground that Aronsen's policies did not cover the type of damage suffered by the M/V Megara. Aronsen then brought suit against the underwriters in the Southern District of New York[2] to recover $250,000, the amount it claimed was due under the policies. On January 4, 1971, Aronsen moved for summary judgment, but its motion was denied.[3] Thereafter, following a trial before Judge Lumbard, sitting by designation, without a jury, judgment was rendered for the defendants, and the complaint was dismissed.

At trial, the issue presented was a narrow one. The parties agreed that Aronsen's policies insured against the total loss of the chartered vessel, but did not cover a partial loss. It was undisputed, moreover, that total loss was comprised of three principal categories:[4] (1) an actual total loss; (2) a constructive total loss—where the expense of recovering and repairing the vessel exceeds its insured value; (3) a compromised total loss—where a claim for constructive total loss is settled by agreement between the insured and the underwriters. In determining whether a compromised total loss had occurred, the parties further agreed that the settlement reached between the *owner* of the M/V Megara and the underwriters of the owner's Hull and Machinery policies[5] would be dispositive of the charterer's claim under the Anticipated Charter Profits policies. Accordingly, since Acres Shipping Co. did submit and subsequently settle a claim with the hull underwriters, the decision below turned on whether this settlement was in discharge of a claim for constructive total loss or for a claim of partial loss of the M/V Megara.

The only testimony introduced at trial was Aronsen's deposition of Richard Rutherford, Adjuster of Claims, and Manager, Lloyd's Underwriters' Claims Office, who had negotiated on behalf of the hull underwriters with the representatives of Acres Shipping. Through Rutherford's deposition and the documentary exhibits introduced in evidence, a clear description of the negotiations surrounding the settlement under the Hull and Machinery insurance policies emerges.

Acres Shipping initially submitted a claim, on February 11, 1967, for a constructive total loss, based on the repair cost estimate of its marine superintend-

---

1. Under such policies the charterer of a vessel is insured against the loss of the profits that he anticipates realizing from use of the vessel during the insured period—in this instance, August 9, 1966 to August 9, 1967.

2. Personal jurisdiction over the defendant underwriters was based on their consent.

3. Judge Metzner's brief memorandum opinion, 68 Civ. 904 (S.D.N.Y. May 12, 1971), denying summary judgment, is not reported.

4. A fourth category, an "arranged total loss," was also covered by the policies, but is in no way relevant to Aronsen's claim.

5. We note that the defendant underwriters were not involved in underwriting the owner's Hull and Machinery insurance policies.

ent, N. Soutos. This claim was immediately rejected by the underwriters on the strength of a repair estimate, prepared by their agent, substantially below the insured value of the M/V Megara.[6] Thereafter, on February 23, Richard Arnold & Son, representing Acres Shipping, tendered a claim for either a constructive total loss or, in the alternative, a partial loss based on unrepaired damage, requesting at the same time an immediate payment of £60,000 on account. Arnold was promptly informed by Rutherford that the underwriters adamantly refused to negotiate unless and until Acres Shipping withdrew its claim for a constructive total loss. Thus, on February 24, Arnold cabled the shipowner in pertinent part as follows:

> Underwriters further state that if the shipowner is prepared to withdraw his right to claim CTL [constructive total loss] (should this be ultimately proved which is doubtful) and elect to treat claim as a partial loss then they will be willing to make an offer in full and final settlement of unrepaired damage claim . . . .

> The choice is yours. Either elect for partial loss and obtain early payment of unrepaired damage or elect for CTL and await settlement until claim proved to satisfaction of underwriters which could take six months or more.

The shipowner responded to this choice in the following telegram to Arnold dated February 27:

> Please inform our underwriters of Megara that if they will be agreeable to make us a satisfactory offer for settlement of unrepaired damage claim we shall withdraw our claim for constructive total loss and *treat this matter as partial loss*. (emphasis added)

Accordingly, in light of this exchange of telegrams, it is not surprising that the final settlement agreement, concluded March 2, 1967, explicitly stated that the sum agreed upon was "in full and final settlement of all claims for unrepaired damage . . . ."—in short, a settlement of the shipowner's partial loss claim.

Despite the clarity of this agreement, Aronsen argued below, and once again on appeal, that the settlement reached between the shipowner and hull underwriters was a compromised *total* loss, rather than a compromised *partial* loss, thereby supporting recovery under the Anticipated Charter Profits policies. Appellant's rationale is a simple one: whenever an owner proffers a claim for constructive total loss, whether or not in combination with a claim in the alternative for a partial loss, and submits figures which, if proved, would substantiate a constructive total loss, then a compromised total loss results if subsequent negotiations produce a settlement. In a thorough opinion, reported at 370 F. Supp. 421 (S.D.N.Y.1973), Judge Lumbard rejected Aronsen's contention on the ground that it strained credulity to assert that *any* claim submitted by the shipowner for a constructive total loss, no matter how frivolous, unsubstantiated, and self-serving for bargaining purposes, would produce a compromised *total* loss, so long as the shipowner received some compensation on his claim. Certainly the facts here adequately support Judge Lumbard's conclusion.

■ Aronsen urges preliminarily that any ambiguity in the coverage of a marine insurance policy must be resolved in favor of the insured. *See, e. g.* Allen N. Spooner & Son v. Connecticut Fire Insurance Co., 314 F.2d 753, 755 (2d Cir.), cert. denied, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963); Henjes v. Aetna

---

**6.** The insured value of the M/V Megara was £140,000. On the basis of Soutos's estimate, Acres Shipping Co. calculated the total repair cost to be £142,539 or £2,539 in excess of the vessel's insured value. Relying on their representative, on the other hand, the underwriters computed the total repair costs to be approximately £100,000, or £40,000 less than the vessel's insured value.

Ins. Co., 132 F.2d 715, 719 (2d Cir.), cert. denied, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed 1711 (1943). Although we do not disagree, we find no ambiguity whatsoever in characterizing the settlement between the shipowner and the hull underwriters as one in respect to a claim for partial loss and, therefore, not within the coverage provisions of Aronsen's Anticipated Charter Profits policies.

Aronsen strenuously contends, however, that a line of English cases,[7] primarily Street v. Royal Exchange Assurance, 19 Com.Cas. 339 (C.A.1914), sustains its view that a settlement concluded after submission of alternative claims of constructive total loss, on the one hand, and partial loss, on the other, must be construed as a compromised total loss. Indeed, we consider *Street* particularly illuminating on this question, although, unfortunately for appellant, not in its favor.

*Street* involved an action brought by an insurance underwriter to recover on a policy of reinsurance. Like Aronsen in this case, the plaintiff in *Street* could only recover on its reinsurance policy if the settlement which it had reached with the shipowner could properly be characterized as a compromised *total* loss. The shipowner had in fact commenced suit against the underwriter claiming in the alternative a constructive total loss or a partial loss. Before that action came to trial, a settlement was effected and it was based on this agreement that the underwriter unsuccessfully sought collection on its reinsurance policy.

The principal opinion in *Street*, written by Lord Reading, contained the following description of the settlement agreement signed by the shipowner and Street:

There is no statement in those terms that the settlement was in respect of the claim for a constructive total loss; neither is there any statement that it was a settlement in respect of the claim for a partial loss. The terms of settlement do not mention either the one or the other.

Street v. Royal Exchange Assurance, *supra*, 19 Com.Cas. at 342. Because of this ambiguity in the settlement agreement, the court, in *Street*, was unable "to say with certainty, from the terms of the document itself, that this compromise was in respect of a claim for constructive total loss [or, it seems fair to say, a compromise in respect of a claim for partial loss]." *Id.* at 344–345. The court chose to resolve this uncertainty in favor of the plaintiff underwriters by concluding that "the claim for constructive loss having been made, and that claim having disappeared as a result of the agreement of compromise, it cannot be said that there has been no settlement of a compromised [total] loss . . . ." *Id.* at 346–347.

In contrast to *Street*, we do not face the ambiguity which required the *Street* court to generalize about the proper characterization of an undifferentiated settlement of alternative claims. Here, not only the exchange of telegrams between the shipowner and its representative, but the settlement agreement itself clearly define the scope of the compromise as one in "full and final settlement of all claims for unrepaired damage [*i. e.*, partial loss]." Accordingly, since *Street* teaches that the court need not go beyond the language of the agreement, where that language precisely describes the basis for settlement, we must conclude that the settlement at issue in this case resulted in a compromised *partial* loss.

■ In sum, we are of the view that the proper barometer for gauging the bona fide nature of the shipowner's initial claim for constructive total loss is his willingness to press that claim until settlement. Where the owner chooses to

---

7. The parties agree that, for purposes of this case, English law provides the best guidance on the determination of what constitutes a compromised total loss.

abandon his constructive total loss claim as a predicate to negotiation, the charterer, like the hull underwriters and the shipowner himself,[8] is bound by that election. We therefore affirm.

8. We note that the shipowner's decision to forego his constructive total loss claim in this instance was costly to it as well as to Aronsen, the charterer. By so doing, Acres Shipping was unable to collect on two additional marine insurance policies, for Increased Value and Freight, totalling £34,000, coverage under which was limited to the total loss of the insured vessel.