996 F.2d 506
 1996 A.M.C. 1278
 MENTOR INSURANCE COMPANY (U.K.) LIMITED and Mentor Insurance
Limited, Plaintiffs-Appellees,
v.
Norges BRANNKASSE; Skandia Insurance Company; Rhone
Mediterranee; Assurance Generales; Ancienne
Mutuell Accident and Transatlantishe, Defendants,
A.I.G. Oil Rig Inc.; New Hampshire Insurance Company;
American Home Assurance Company; National Union
Fire Insurance Company and American
Reinsurance Company,
Defendants-Appellants.
 No. 1067, Docket 92-7905.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 1, 1993.
Decided May 24, 1993.
 
 Bernard London, New York City (James L. Fischer, Richard S. Endres, Ellen M. Boyle, Nicholas Kalfa, London Fischer, New York City, of counsel), for plaintiffs-appellees.
 John M. Woods, New York City (Thacher, Proffitt & Wood, New York City, of counsel), for defendants-appellants.
 Before MESKILL, Chief Judge, and FEINBERG and JACOBS, Circuit Judges.
 JACOBS, Circuit Judge.
 
 
 1
 Defendants-appellants appeal from two orders of the United States District Court for the Southern District of New York (Edelstein, J.). By order dated July 20, 1992, the district court adopted in whole the final report of a special master holding defendants-appellants jointly and severally liable to plaintiffs-appellees under a reinsurance contract, and awarding pre-judgment and post-judgment interest, as well as attorneys fees incurred in this action and in a related action also commenced in the Southern District of New York. By prior order, dated March 16, 1990, the district court denied defendants-appellants' request to move to amend their answers to assert a new affirmative defense. For the reasons stated in this opinion, we affirm in part and reverse and remand in part.
 
 BACKGROUND
 
 2
 A. The Insurance Policies. Ocean Drilling and Exploration Company ("ODECO") owns a number of vessels used in ocean drilling and oil exploration, including a jack-up rig named the "Ocean Champion". For the period January 22, 1980 through December 31, 1980, ODECO maintained two policies insuring the Ocean Champion and other vessels against hull and machinery damage. One policy insured the Ocean Champion up to the vessel's stipulated loss value of $22 million, less a $1 million deductible. This policy was issued by Oil Insurance Ltd. ("OIL"), and is referred to hereinafter as the "OIL Policy". The second policy insured ODECO's $1 million exposure under the OIL Policy's deductible clause. This second policy is referred to hereinafter as the "Deductible Policy". The Deductible Policy thus insured ODECO against the first $1 million of hull and machinery damage sustained by the Ocean Champion and the OIL Policy insured ODECO for up to $21 million of hull and machinery loss.
 
 
 3
 Ninety-five percent of the risk under the Deductible Policy was assumed by plaintiffs-appellees Mentor Insurance Ltd. and Mentor Insurance Company (U.K.) (collectively, "Mentor"), which were captive insurance companies of ODECO. The remaining five percent of the risk under the Deductible Policy was assumed through defendant-appellant A.I.G. Oil Rig, Inc. ("AIG"), as managing general agent for defendants-appellants New Hampshire Insurance Company, American Home Assurance Company and National Union Fire Insurance Company. Even though the group of underwriters participating through AIG insured only five percent of the Deductible Policy, AIG was designated to set the terms of the cover, and to take the "lead" in underwriting and handling claims under the Deductible Policy--presumably because Mentor is a captive of the policyholder.
 
 
 4
 B. The Reinsurance Contract. Mentor reinsured all of its ninety-five percent participation in the $1 million Deductible Policy. As evidenced by the cover note issued by reinsurance intermediary Thos. E. Leeds Company, Inc. ("Leeds"), AIG subscribed to 40 percent of the $950,000 reinsurance cover (here too acting on behalf of New Hampshire Insurance Company, American Home Assurance Company and National Union Fire Insurance Company); American Reinsurance Company subscribed to 25 percent, and certain alien entities (the "Foreign Reinsurers") subscribed to the rest in various small percentages. The Foreign Reinsurers include Norges Brannkasse (a Norwegian company), Skandia Insurance Company (a Swedish company), and Rhone Mediterranee, Assurance Generales, Ancienne Mutuell Accident and Transatlantishe (each a French company).
 
 
 5
 This controversy arises out of the following "condition" recited in the cover note: the reinsurance coverage is "[s]ubject to all terms, clauses, conditions and settlements as original but only to cover in respect of Total and/or Constructive and/or Arranged and/or Compromised Total Loss of Unit."
 
 
 6
 C. The Casualty. On December 10, 1980, the Ocean Champion sank in the Mediterranean Sea while being towed from a shipyard in Port Said, Egypt, to an offshore drilling location. The Ocean Champion was raised two months later, towed to Greece, then to Portugal and finally to the United States, where it arrived on August 7, 1981; the rig was repaired, upgraded and returned to service.
 
 
 7
 OIL, Mentor and AIG were advised of the casualty one day after the loss. The following day, Mentor wrote to the reinsurance intermediary, Leeds, notifying the reinsurers that the sinking of the Ocean Champion could result in a constructive total loss (sometimes hereinafter "CTL"). OIL retained Rush Johnson and Associates, Ltd. ("Rush Johnson") to represent its interests in surveying and adjusting the loss. AIG expressly approved of Rush Johnson's appointment to survey and adjust the Ocean Champion loss with respect to the Deductible Policy as well.
 
 
 8
 Thereafter, AIG opened files for the insurance claim as well as for the reinsurance claim, establishing a 100 percent reinsurance loss reserve. On January 20, 1982, ODECO's insurance broker, Marsh & McLennan, advised AIG and Mentor that the Ocean Champion was undergoing repairs, that the cost of repairs had exceeded $1 million, and that the OIL Policy had already made partial payment net of the deductible. Accordingly, Marsh & McLennan asked AIG and Mentor to pay their limits under the Deductible Policy, and the insurers promptly remitted $1 million to ODECO on a partial loss basis.
 
 
 9
 Meanwhile, OIL and ODECO had begun what became protracted negotiations to settle ODECO's claim under the OIL Policy. In the negotiations, OIL sought to designate the loss as a CTL, because that designation would allow OIL to deduct salvage value. ODECO resisted, but ultimately agreed to accept payment on that basis rather than submit to the prolonged invoice-by-invoice review of the repairs that OIL threatened to conduct before it would make further payment on the basis of a partial loss. ODECO agreed to the final adjustment as a CTL in or about April 1983, and accepted $19 million from OIL, a sum representing the Ocean Champion's stipulated loss value of $22 million, less (a) the OIL Policy's $1 million deductible and (b) $3 million as the agreed salvage value of the rig after it was damaged.
 
 
 10
 On August 4, 1983, Mentor as ceding insurer sent its Notice of Reinsurance Loss to Leeds, the reinsurance broker, and described the Ocean Champion as a CTL. Leeds in turn sent letters to American Reinsurance Company and AIG, advising that the claim was a CTL and therefore covered under the reinsurance contract, and requesting that payment be made to Mentor. AIG, on behalf of the lead reinsurers, refused to pay the claim, asserting three grounds for its disclaimer: lack of sufficient documentation; failure of the vessel owner to give notice of abandonment of the vessel as a precondition to CTL coverage; and the obligation of the reinsurers to follow settlements only "as original" (i.e., only as settled under the reinsured Deductible Policy). American Reinsurance Company sent a check to Leeds in respect of its full share of the reinsurance coverage, but Leeds returned that payment a year later with an explanation that the Ocean Champion reinsurance claim was unresolved and appeared likely to remain unresolved for some time. The Foreign Reinsurers, who received notice soon after the domestic reinsurers were advised, also remitted their share of the coverage, and Leeds placed those funds in an interest-bearing account pending resolution of the dispute between Mentor and AIG.
 
 
 11
 D. Procedural History. On March 1, 1985, Mentor brought suit in federal district court against AIG and Mentor's domestic reinsurers (New Hampshire Insurance Company, American Home Assurance Company, National Union Fire Insurance Company and American Reinsurance Company), invoking that court's admiralty jurisdiction and diversity jurisdiction. (Although AIG did not underwrite any portion of the reinsurance risk, for convenience we will refer hereinafter to AIG and Mentor's domestic reinsurers collectively as the "Domestic Reinsurers".) The Foreign Reinsurers were named in the original complaint, but they were never served and have not appeared.
 
 
 12
 The Domestic Reinsurers, appearing by the same counsel, each denied liability on the ground that the Ocean Champion claim "was never a constructive, compromised or arranged total loss and was never abandoned to underwriters." AIG additionally defended itself on the basis that it did not act as a principal or underwriter in the binding of the reinsurance contract and did not accept for its own account any portion of the ceded risk.
 
 
 13
 Over the ensuing four years, the parties engaged in discovery which included, according to the Domestic Reinsurers, the taking of twelve depositions. During this period, the case was twice reassigned, resting with Judge Edelstein in May 1988.
 
 
 14
 In October 1989, the Domestic Reinsurers advised the district court that they wished to amend their answers to assert a new defense. The gist of the proposed defense was that, in the event the Domestic Reinsurers were found liable, the recovery should be reduced in part or in whole to the extent that Mentor actually received or was entitled to receive funds by way of subrogation. Specifically, the reinsurers sought to amend their answers to allege (1) that ODECO, and OIL as subrogee, had recovered $17.5 million in settlement of their suit against the owners of the tugboats that were towing the Ocean Champion at the time of the casualty; (2) that Mentor is entitled under the terms of the OIL Policy to a pro rata apportionment of OIL's share of the $17.5 million settlement; and therefore (3) that any such subrogation should reduce Mentor's recovery under the reinsurance contract. Pursuant to Judge Edelstein's individual rules, the litigants were required to seek permission before making motions, and the Domestic Reinsurers made that preliminary application by letter dated March 10, 1990. By order filed March 19, 1990, Judge Edelstein denied the Domestic Reinsurers' application to make their motion for leave to amend. The record does not reflect that the district court considered the merits of the Domestic Reinsurers' motion.
 
 
 15
 On October 31, 1990, the parties accepted a stipulated order of reference ("Stipulated Order of Reference" or "Order of Reference") assigning the case to be tried without a jury before a special master agreed upon by the parties. Among other things, the Stipulated Order of Reference established procedural ground rules, including: that the parties be permitted to submit briefs to the special master before he issued a draft report; that the parties be permitted to submit objections to the special master before he issued his final report; that the parties be permitted to submit objections to the special master's final report to the district court; that the district court review the special master's final report and any objections thereto; that the district court accept the special master's findings of fact unless they were clearly erroneous or based upon inadmissible evidence; and that the special master's findings of fact, to the extent adopted or modified by the district court, form the basis for the opinion or judgment of the district court. The Stipulated Order of Reference also fixes and apportions compensatory damages among the domestic reinsurers in the event the special master were to find them "liable under the cover note for the subject reinsurance risk." Special Master Thomas D. Crittenden presided over nine days of testimony given over a period of thirty-seven days in June and July 1991.
 
 
 16
 E. Findings and Conclusions Below. At the close of testimony, Mentor moved for what it styled a directed verdict, and the Domestic Reinsurers cross-moved for a directed verdict in their favor. On August 8, 1991, the special master sent to the district court his "Findings of Fact, Conclusions of Law and Order of Directed Verdict". The district court and the parties have treated those findings and conclusions as the "final written report" required by the Order of Reference. The findings and conclusions were issued without first accepting briefs or suggestions from the parties as prescribed in the Order of Reference. Mentor prevailed in every respect.
 
 
 17
 Among his "Findings of Fact", the special master made the following determinations that are germane to the issues presented on this appeal: (1) that AIG specifically authorized and approved the retention of Rush Johnson to represent AIG in surveying and adjusting the Ocean Champion loss; (2) that OIL waived its right to receive notice of abandonment; (3) that ODECO's Ocean Champion loss was settled by OIL on the basis of a CTL; (4) that ODECO's claim under the OIL policy was an insured risk and that OIL's settlement of that claim as a CTL was an arms-length transaction untainted by fraud, collusion or bad faith; (5) that ODECO's claim under the Deductible Policy was an insured risk and that Mentor's settlement of that claim was an arms-length transaction untainted by fraud, collusion or bad faith; and (6) that AIG declined to accept the settlement of the Ocean Champion loss as a CTL under the reinsurance contract, and that American Reinsurance Company followed AIG's lead.
 
 
 18
 Among his "Conclusions of Law", the special master made the following determinations that are germane to the issues presented on this appeal: (1) that, as a matter of custom and practice, whenever a valid, covered insurance claim is settled without fraud and in good faith, and the conditions of the reinsurance contract are met, the reinsurer is obligated to "follow the fortunes" of its ceding company and pay its portion of the reinsurance claim; (2) that the settlement of the Ocean Champion loss under the OIL Policy as a CTL "actuated" the risk assumed by the Deductible Policy and thereby "trigger[ed]" the total loss risk ceded to the reinsurers; and (3) that a valid reinsurance loss cession was made and the reinsurers were required to pay the reinsurance loss ceded to them.
 
 
 19
 The special master further ruled that the legal fees and expenses incurred by Mentor be awarded against the Domestic Reinsurers "[b]y reason of no valid reasonable basis in fact being found for defendants' failure, since September 13, 1983, to honor the reinsurance loss that was properly ceded to them; and, because of defendants breach of the principles of follow the fortunes and utmost good faith."
 
 
 20
 On September 6, 1991, the Domestic Reinsurers submitted a 48-page brief to Judge Edelstein, objecting to the special master's report. The Domestic Reinsurers argued (1) that because the special master declined to accept briefs, as the Stipulated Order of Reference required him to do, he failed to identify or consider whether the loss of the Ocean Champion was a constructive total loss; (2) that the special master ignored the reinsurance policy language that it was to follow settlements as "original"; (3) that the special master misapplied the "follow the fortunes" principle because the reinsurance provided coverage only in the event of a total loss of the vessel; (4) that the final report was issued without authority and is insufficiently detailed; (5) that the final report is tainted by erroneous findings and evidentiary rulings; (6) that the court's refusal to allow amendments to the answers deprived the reinsurers of the ability to submit evidence on a substantial subrogation award that could reduce Mentor's recovery; and (7) that there is no basis for the award of attorneys fees against the defendants.
 
 
 21
 At a hearing on November 8, 1991, the parties presented arguments as to whether or not the special master's report should be adopted. In addition, the special master answered questions concerning his management of the case, and advised the district court that his deviation from the procedures outlined in the Order of Reference was due in part to his belief that the parties had already provided him with sufficient briefing. Specifically, the parties had submitted to the special master memoranda, letter briefs, or both, in connection with (a) their cross-motions for "directed verdict"; (b) Mentor's motion to preclude the introduction of any evidence regarding the adjustment of the loss, which included extensive briefing on the follow-the-fortunes principle; (c) the Domestic Reinsurers' motion in limine to obtain a ruling that Mentor may not object to the introduction into evidence of two settlement agreements reached in the action brought by OIL and ODECO against the owners, operators, managers and insurers of the tugs that towed the Ocean Champion; and (d) the Domestic Reinsurers' hearsay objection to the introduction into evidence of certain deposition testimony.
 
 
 22
 At the end of the November 8, 1991 hearing, Judge Edelstein rejected the Domestic Reinsurers' procedural arguments; ruled that the special master did not abuse his discretion; and recited that the Domestic Reinsurers' objections to the final report were "disingenuous". The district court then directed Mentor to submit an order confirming the special master's report.
 
 
 23
 Mentor's proposed order provoked a 22-page brief from the Domestic Reinsurers attacking proposed terms concerning joint and several liability, interest, attorneys fees and the fees of the special master. As to these matters, the Domestic Reinsurers argued (1) that their liability should not be joint and several, but rather should be apportioned among them as stated in the Stipulated Order of Reference of October 31, 1990; (2) that the nine percent rate for pre-judgment and post-judgment interest, and the monthly compounding thereof, were excessive; (3) that there was no basis for allowing Mentor to submit a further order for an award of attorneys fees and expenses related to Mentor's execution of the judgment and its opposition to any appeal or subsequent proceedings taken by the Domestic Reinsurers; (4) that they should not be required to pay all of the special master's fees and expenses, because the Stipulated Order of Reference provides that plaintiffs and defendants would each pay half of these costs; and (5) that an award of attorneys fees in the amount of $551,695.12 was unconscionable and unsupported by invoices or details of payment. Without objection from the parties, Judge Edelstein referred these issues to the special master. The special master thereafter issued "Proposed Modifications to Plaintiffs' Proposed Order dated December 16, 1991", addressing each of the disputed issues, but recommending no changes other than as to the compounding of interest and the amount of his unpaid fees. Specifically, the special master proposed that pre- and post-judgment interest be compounded annually rather than monthly, and that his unpaid fee be increased by $5,980 to $11,015.70 (for which amount the Domestic Reinsurers should be solely liable). The Domestic Reinsurers then briefed their objections to the special master's proposed modifications.
 
 
 24
 By final order entered on July 30, 1992, the district court overruled all objections to the special master's report and adopted the special master's report, as modified, in toto.
 
 
 25
 F. The Appeal. The Domestic Reinsurers appeal from the district court's orders of March 16, 1990 and July 20, 1992. With respect to the 1990 order, the Domestic Reinsurers submit that, whatever may be the merits of their motion for leave to amend, the court erred in simply refusing to allow the motion to be made. As to the 1992 order, the Domestic Reinsurers contend that the district court erred in ruling: (1) that the special master's Findings of Fact are not clearly erroneous; (2) that the special master's Conclusions of Law are not in error; (3) that the reinsurers are jointly and severally liable for the award of compensatory damages; (4) that the reinsurers owe pre-judgment interest; and (5) that the reinsurers pay Mentor's legal fees.
 
 DISCUSSION
 I. Jurisdiction and Choice of Law
 
 26
 The complaint alleges diversity and admiralty jurisdiction. In initial briefing to this Court, all parties recited that subject matter jurisdiction over this dispute was in admiralty, and it is apparent that the district court and the parties assumed that disputes involving marine reinsurance contracts are subject to federal admiralty jurisdiction, an issue never decided by this Court. The face of the complaint, which names alien corporations both as plaintiffs and defendants, presents a question as to the existence of diversity jurisdiction.
 
 
 27
 Since we are obliged to satisfy ourselves that jurisdiction exists, Oneida Indian Nation v. New York, 860 F.2d 1145, 1151 (2d Cir.1988), cert. denied, 493 U.S. 871, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989), at oral argument we asked the parties to submit letters briefing jurisdiction. The Domestic Reinsurers now argue that marine reinsurance contracts are not subject to admiralty jurisdiction, that diversity jurisdiction was defeated by the naming of foreign entities as plaintiffs and as defendants, and that there is therefore no federal subject matter jurisdiction whatsoever.
 
 
 28
 We conclude that diversity jurisdiction does exist. Although the alignment of alien corporations as both plaintiffs and defendants defeats the allegation of diversity jurisdiction (See 28 U.S.C. § 1332(a)(2); Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786 (2d Cir.1980), cert. denied 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981)), the record as a whole clearly demonstrates that the Foreign Reinsurers were never served with the complaint and have never appeared. Federal Rule of Civil Procedure 4(j) sets the time limit for service of a summons and complaint:
 
 
 29
 If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion. This subdivision shall not apply to service in a foreign country pursuant to subdivision (i) of this rule.
 
 
 30
 The Foreign Reinsurers were not "served within 120 days after the filing of the complaint", and Mentor--"the party on whose behalf service was required"--has not undertaken to "show good cause why such service was not made," but is itself requesting that the Foreign Reinsurers be dismissed. Fed.R.Civ.P. 4(j). Had the district court addressed the issue, it would have been required to dismiss the action as to the Foreign Reinsurers. See, e.g., Montalbano v. Easco Hand Tools, Inc., 766 F.2d 737, 740 (2d Cir.1985) (foreign country exception to Rule 4(j) is inapplicable where service is not attempted under subdivision (i)); Shaw v. Rolex Watch U.S.A., Inc., 745 F.Supp. 982, 987-88 (S.D.N.Y.1990) ("complete failure to justify the delay warrants dismissal under Rule 4(j)"). On this record, however, remand is unnecessary. Pursuant to Rule 4(j), and upon Mentor's request, we hereby dismiss the action as to the Foreign Reinsurers. Cf. Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) (Federal Rule of Civil Procedure 21 authorizes a court of appeals to dismiss a dispensable nondiverse party).
 
 
 31
 Having found one basis for jurisdiction, we have no reason to decide whether or not this controversy also arises under the district court's admiralty jurisdiction, except insofar as admiralty jurisdiction might affect choice of law for resolving other issues raised on appeal. See, e.g., State Trading Corp. v. Assuranceforeningen Skuld, 921 F.2d 409, 414 (2d Cir.1990) (basis of jurisdiction, be it in admiralty or diversity, affects the application of choice of law rules). In admiralty cases, federal maritime law applies where it exists. See Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409-11, 74 S.Ct. 202, 204-206, 98 L.Ed. 143 (1953); Larios v. Victory Carriers, Inc., 316 F.2d 63, 65 (2d Cir.1963). "A federal court sitting in admiralty must apply federal choice of law rules." State Trading Corp., 921 F.2d at 414 (citations omitted). In diversity cases, the choice of law rules of the forum state (in this instance New York) are applied. See Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); Krauss v. Manhattan Life Insurance Co., 643 F.2d 98, 100 (2d Cir.1981).
 
 
 32
 All parties have presumed the existence of admiralty jurisdiction and have briefed the issues on the basis of federal law. Although parties cannot confer admiralty jurisdiction by consent, parties in a diversity action may be bound by their assumption that admiralty law governs. Under New York law, "in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." Walter E. Heller & Co. v. Video Innovations, Inc., 730 F.2d 50, 52 (2d Cir.1984) (citations omitted). Here all parties have relied on federal law, and no party has asked that any alternative body of law be applied to any issue. See, e.g., Defendants-Appellants' Brief at 39 ("state law ... is wholly inapplicable"); Plaintiffs-Appellees' Brief at 41 ("federal law governs"). Under these circumstances, it is unnecessary for us to determine whether or not admiralty jurisdiction was properly invoked, since we will apply federal maritime law, to the extent it exists, in either event.
 
 II. Reinsurance Coverage
 A. Standard of Review
 
 33
 The findings of a special master, to the extent they are adopted by the district court, are considered as the findings of the court and cannot be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a). "When reviewing a district court's legal conclusions, our scope of review is de novo." Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775, 780 (2d Cir.1991) (citing 9 C. Wright & A. Miller, Federal Practice & Procedure § 2588, at 750 (1971)).
 
 
 34
 A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. 470 U.S. at 574, 105 S.Ct. at 1511 (citations omitted).
 
 
 35
 The special master's conclusion that reinsurance coverage exists for Mentor's payment of the Ocean Champion claim is premised on certain findings of fact, including determinations of custom and practice, that he made after nine days of testimony. Although the special master's determination as to the "custom and practice in reinsurance" and as to the application of the reinsurance policy "[u]nder the facts of this case" are framed as "Conclusions of Law", such determinations are findings of fact which may not be set aside unless clearly erroneous. See, e.g., Erie R. Co. v. The Cornell No. 20, 164 F.2d 763, 766 (2d Cir.1947) (labeling fact findings as "conclusions of law" is immaterial); See also United States Naval Institute v. Charter Communications, Inc., 875 F.2d 1044, 1048-49 (2d Cir.1989) (determination of custom and practice is a finding of fact).
 
 B. The Coverage Issues
 
 36
 The main coverage issue presented to the finder of fact was whether or not the Ocean Champion loss was a total loss under the total-loss-only reinsurance coverage. We find that the Domestic Reinsurers offer no ground on which the district court or this Court could find that the special master's factual findings are clearly erroneous; nor do they offer any case law, from any jurisdiction, that subverts the special master's legal conclusions.
 
 
 37
 The Deductible Policy unquestionably owed coverage to ODECO for $1 million of hull and machinery loss. The reinsurance undertaking was narrower and was "only to cover in respect of Total and/or Constructive and/or Arranged and/or Compromised Total Loss of Unit." No party urges that the Ocean Champion's loss was literally "Total" within the meaning of the policies. Nor does any party argue for or against the idea that the Ocean Champion's loss was an "Arranged Total Loss," whatever that may be. The Domestic Reinsurers argue (and Mentor does not dispute) that the loss could not have been a compromised total loss, because the claims submitted by ODECO and compromised by OIL and Mentor were claims for partial loss. Therefore, the parties agree that the reinsurers pay only if the Ocean Champion was a constructive total loss.
 
 
 38
 On appeal, as below, the Domestic Reinsurers argue (a) that OIL's settlement was in the nature of a partial loss (however it was designated); (b) that there can be no CTL unless the owner tenders abandonment of the vessel to the insurers promptly after the casualty; (c) that OIL's settlement of the loss as a CTL had no bearing upon the Deductible Policy; and (d) that Mentor's final classification of the loss under the Deductible Policy does not bind its reinsurers. We address these arguments separately below.
 
 
 39
 1. Constructive Total Loss. The Domestic Reinsurers assert that, "[h]ad the Special Master permitted briefs to be submitted, he would have learned that Oscar L. Aronsen, Inc. v. Compton, 495 F.2d 674 (2d Cir.1974) is directly on point and requires that the adjustment herein be recognized for what it is, namely, a compromise of a partial loss that does not trigger any [total-loss-only] coverage." On the whole, the Aronsen case supports the opposite conclusion.
 
 
 40
 In Aronsen, the vessel ran aground, was refloated, and later scrapped after the owner declined to repair it. The shipowner had submitted a CTL claim to its hull and machinery insurer. The insurer threatened to delay payment "until claim proved to satisfaction of underwriters which could take six months or more," unless the shipowner was willing to negotiate a quick payment on a partial loss basis. 495 F.2d at 676. The shipowner withdrew its original claim and accepted a partial loss settlement. The charterer of the vessel had also purchased insurance under Anticipated Charter Profit policies that owed coverage only in the event of a total loss (actual, constructive, compromised or arranged). The dispute in Aronsen arose between the charterer and its insurers. However, "[i]n determining whether a total loss had occurred, the parties ... agreed that the settlement reached between the owner of the [vessel] and the underwriters of the owner's Hull and Machinery policies would be dispositive of the charterer's claim under the Anticipated Charter Profits policies." Id. at 675 (emphasis in original) (footnote omitted). The charterer argued that the settlement of the owner's hull and machinery claim was a compromise of the original total loss claim and was therefore a "compromised total loss". This Court concluded that the proper character of the claim is determined by reference to the settlement ultimately negotiated at arms length rather than by reference to the possibly self-serving characterization of the claim by the owner:
 
 
 41
 In sum, we are of the view that the proper barometer for gauging the bona fide nature of the shipowner's initial claim for constructive total loss is his willingness to press that claim until settlement. Where the owner chooses to abandon his constructive total loss claim as a predicate to negotiation, the charterer, like the hull underwriters and the shipowner himself, is bound by that election.
 
 Id. at 677-78. (Footnote omitted.)
 
 42
 The present appeal is a partial mirror image of Aronsen in the sense that in each case the claim was submitted on one basis and settled on another. Aronsen thereby supports the view that the loss transaction is defined by the terms of the bona fide settlement, rather than by the designation of the original claim. In other respects as well, Aronsen supports the special master's disposition of the present dispute. Here as in Aronsen the policyholder collected less under the settlement than it would have collected under its original claim. While the Domestic Reinsurers emphasize that the CTL settlement was induced in part by OIL's threat to conduct a time-consuming audit,[1] similar pressure was brought to bear in Aronsen without subverting the commercial reality of the loss basis ultimately negotiated by the parties. Id. at 676.
 
 
 43
 The Domestic Reinsurers also suggest that the settlement was tainted by the inbred corporate relationships among ODECO, Mentor and OIL (an assertion at odds with the Domestic Reinsurers' parallel argument that the settlement was forced on ODECO by OIL). However, the Domestic Reinsurers were aware of those corporate relationships from the outset and point to no evidence contrary to the special master's conclusion that the OIL-ODECO settlement "was settlement of an insured risk and was an untainted, arms-length transaction involving no fraud, collusion or bad faith."
 
 
 44
 2. Notice of Abandonment. The Domestic Reinsurers contend that an invariable requirement of a constructive total loss is that the owner give notice of abandonment by offering the vessel to the underwriters promptly after the loss. The special master found that OIL waived notice of abandonment. The Domestic Reinsurers argue that there is no evidence of such a waiver.
 
 
 45
 Notice of abandonment is not the subject of any stipulated fact; the reinsurance contract contains no such clause; while we could not fully examine the Deductible Policy (which has been blurred by excessive photocopying), neither party cites a notice of abandonment clause in the Deductible Policy; the OIL Policy merely references such notice generally. In resolving these issues, the special master had to rely upon testimony and treatises concerning industry custom and practice and upon the parties' prior course of conduct.
 
 
 46
 Case law suggests that notice of abandonment is not an absolute prerequisite to a CTL claim. See Rock Transport Properties Corp. v. Hartford Fire Insurance Co., 312 F.Supp. 341, 347 (S.D.N.Y.), aff'd, 433 F.2d 152 (2d Cir.1970); Fishing Fleet, Inc. v. Trident Insurance Co., 598 F.2d 925, 926 n. 1 (5th Cir.1979). Moreover, there is adequate record support for the findings that notice of abandonment is not treated in the industry as a prerequisite to a claim for total loss; that a policyholder may, with the indulgence of its insurer, defer a decision on abandonment until final settlement occurs; that acceptance of the tender is rare; and that waiver is an accepted practice. Mentor adduced evidence that AIG previously paid a CTL for another rig covered under the same reinsurance contract even though there had been no notice of abandonment, and did so without protest and without compromise. The Domestic Reinsurers' expert, Leslie Buglass, testified that notice of abandonment promptly after the casualty is an indispensable element of such a CTL claim; but Mr. Buglass' own treatise discusses total loss without mentioning notice of abandonment. (Mr. Buglass resolved at trial to "put it in the fourth edition.") The Domestic Reinsurers also relied on the testimony of David Seaberg, an AIG claims adjuster at the time of the Ocean Champion loss, who had worked on marine and oil rig claims for various insurers since 1962. However, Mr. Seaberg admitted on cross-examination that he had never demanded notice of abandonment on a reinsurance claim prior to the Ocean Champion, and that the Ocean Champion claim was the first occasion he could recall in which he declined coverage on the ground that the claim was not a valid CTL.
 
 
 47
 The Domestic Reinsurers, relying upon the following passage from Calmar S.S. Corp. v. Scott, 209 F.2d 852, 854 (2d Cir.1954), argue that as a matter of law notice of abandonment cannot be postponed or waived:
 
 
 48
 As we have said, [a CTL] is granted to relieve the owner of the embarrassment of having upon his hands a ship, completely useless as she lies, and being without remedy until such time as she can be recovered and repaired, which may mean an indefinite postponement. For this reason he must invoke the privilege in season: and, as a corollary, his right to do so depends, not upon what the expense turns out in the end to be, but upon what it probably will be, "so far as any reasonable calculation can be made, in the highest degree of probability."
 
 
 49
 (Footnotes omitted.) This passage establishes what a shipowner must do to preserve its "right" to assert a total loss vis-a-vis its insurer; it does not imply that an untimely assertion of a CTL claim is impossible even if the insurer is willing to consider it and pay it, or where (as here) the insurer solicits it. This Court has recognized (1) that an insurer may waive defenses at any time after it acquires knowledge that the defense might be applicable, New York v. AMRO Realty Corp., 936 F.2d 1420, 1430 (2d Cir.1991); and (2) that a reinsurer cannot second guess the reinsured's good faith decision to waive defenses. Christiania General Insurance Corp. v. Great American Insurance Co., 979 F.2d 268, 280 (2d Cir.1992) (citing Unigard Security Insurance Co. v. North River Insurance Co., 762 F.Supp. 566, 586 (S.D.N.Y.1991)). See also B. Ostrager & T. Newman, Handbook on Insurance Coverage Disputes § 2.06, at 57 (5th ed. 1992) (waiver has been found where there is direct or circumstantial proof that an insurer intended to abandon a policy defense). OIL's settlement of the claim on the basis of a constructive total loss without notice of abandonment is in itself abundant evidence of waiver, and the special master did not err in reaching that conclusion.
 
 
 50
 3. The Follow the Fortunes Principle. The Domestic Reinsurers' most fundamental challenge to the district court's July 20, 1992 order is their contention that "the Special Master's discussion concerning the princip[le] of 'follow the fortunes' is simply inapplicable in the context of this case." The special master recited the following as "Conclusions of Law":
 
 
 51
 Custom and practice in reinsurance includes the principle of "Follow the Fortunes"....
 
 
 52
 "Follow the Fortunes" requires reinsurers to follow the insurance fortunes of the reinsured. The insurance fortunes with respect to a claim contemplate a valid, covered insurance claim that is settled in good faith and without fraud in any form or breach of a condition of the reinsurance contract. Simply put in a pure sense, "Follow the Fortunes" means that when the subject matter of the insurance is settled, such settlement requires the reinsurer to follow the fortunes of the reinsured by paying the portion of the insurance that is ceded under the reinsurance contract to the reinsurer.
 
 
 53
 ....
 
 
 54
 It is clear that settlement under the OIL hull and machinery policy of the OCEAN CHAMPION loss as a CTL total loss automatically actuated the [Deductible] Policy. It necessarily follows that settlement of the OCEAN CHAMPION loss as a CTL total loss under the OIL Policy triggers first the CTL risk assumed by the [Deductible Policy] and thereby triggers the total loss risk ceded to reinsurers....
 
 
 55
 The Domestic Reinsurers contend that there is no support for the "actuating" and "triggering" of coverages that takes place in this passage, and that there is no defensible finding or conclusion that binds them to follow OIL's coverage decision.
 
 
 56
 The parties agree that the reinsurance contract contains a "follow the fortunes" clause. It recites in part that the total-loss-only reinsurance coverage is "[s]ubject to all terms, clauses, conditions and settlements as original." Mentor seizes upon the word "settlements", and argues that its reinsurers must pay because: (1) Mentor gave its reinsurers notice that the loss could turn out to be a CTL; (2) Mentor paid its $950,000 limit before OIL made its final determination as to how the loss should be classified; and (3) when OIL and ODECO settled their claim as a CTL, Mentor submitted its "Notice of Reinsurance Loss" to Leeds on that basis. The Domestic Reinsurers admit that they follow settlements, but emphasize that they do so only "as original", and argue that they need not pay because (1) the "original" policy reinsured is the Deductible Policy; (2) that the Domestic Reinsurers therefore are not bound to "follow" the settlements of OIL; and (3) the Deductible Policy paid the Ocean Champion loss as a partial loss, and did so more than a year before the OIL settlement of the same loss as a constructive total loss.
 
 
 57
 The Domestic Reinsurers are in part correct. The follow-the-fortunes principle does not change the reinsurance contract; it simply requires payment where the cedent's good-faith payment is at least arguably within the scope of the insurance coverage that was reinsured. See Unigard Security Insurance Co. v. North River Insurance Co., 762 F.Supp. 566, 587 (S.D.N.Y.1991). However, in the reinsurance contract at issue, the phrase "settlements as original" is not self-executing; and a finder of fact may consider testimony as to how this phrase is properly applied where the ceding insurer covers the deductible portion of another policy that is written and administered by another insurance company, and where the loss under both policies is surveyed and adjusted by the same firm (here, Rush Johnson).
 
 
 58
 After a review of the evidence on this issue, we are not left with a definite and firm conviction that a mistake has been committed. Jack Akehurst, who was a marine underwriter working at Mentor at the time of the Ocean Champion loss, testified at trial that the "follow settlements as original" language "referred to the deductible policy, but that itself was driven by the OIL policy." Mentor's former Vice President of Claims, Louis Potts, explained how he would determine whether or not a constructive total loss existed for purposes of the reinsurance contract: "[S]ince the policy that this reinsures is a deductible policy, first loss policy, we would have to look to the [OIL] policy and what sort of action and determinations they made.... If they said that it was a Total Loss obviously it would be as well on the deductible policy."
 
 
 59
 Once the finder of fact decided that prompt notice of abandonment was waivable, and had in fact ultimately been waived, the designation of the payment at the time it is made is unimportant in deciding whether the loss was partial or total for final classification purposes. Since Mentor's insurance obligation was broader than the reinsurance, and arose regardless of whether the loss was partial or total, Mentor's obligation could well become payable before the repairs were sufficiently advanced for anyone to determine whether or not the casualty was a CTL. OIL had the lead role in monitoring the repairs, and was evidently content to make partial payment along the way without hurrying to conclude its negotiations with ODECO on the classification of the loss. Mentor could not defer payment of an amount then due so that it could await developments on repair and the related negotiations. Certainly, Mentor could not have long delayed payment for reasons related to the collectibility of reinsurance without breaching its obligation to its policyholder. The finder of fact could therefore assume that, until OIL and ODECO agreed on the extent and classification of the loss (with the help of Rush Johnson), Mentor had no basis for deciding whether or not its $950,000 payment was on account of a CTL.
 
 
 60
 4. Final Classification of the Loss. The Domestic Reinsurers complain that Mentor re-classified the claim as one for constructive total loss after the Ocean Champion had returned to service. That anomaly, if it occurred, results from OIL's prolonged negotiation with ODECO, the mounting costs ascribed to the repair, and OIL's willingness to waive notice of abandonment. There is nothing sinister about Mentor's ultimate classification of the loss under the Deductible Policy to conform to OIL's classification of the loss under the hull and machinery policy. Since the special master found that the negotiations between Mentor and OIL were conducted and concluded in good faith, Mentor's final classification of the claim provides no ground for reversal on appeal.C. Liability Under the Cover Note
 
 
 61
 The district court adopted the special master's conclusion that "[u]nder the facts of this case, therefore, settlement of the OCEAN CHAMPION loss as a total loss under the hull and machinery insurance contract triggers coverage under the total loss only ("TLO") reinsurance cover note contract that provides reinsurance of the TLO risk ceded by plaintiff reinsureds to defendant reinsurers."
 
 
 62
 After a careful review of the record, we are satisfied that there is adequate evidentiary support for that conclusion. We recognize that in arriving at that conclusion, the special master disregarded a number of procedural mandates set forth in the Order of Reference. We also recognize that the district court failed to exercise meaningful review in respect of the special master's findings and conclusions. The special master's procedural errors, however, did not affect any of the Domestic Reinsurers' significant rights. The district court's failure to supervise is likewise harmless because this Court, in reviewing the July 20, 1992 order that adopted the special master's final recommendations, has reviewed the special master's report under the same standards that the district court should have applied.
 
 
 63
 This Court must examine the record "without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111 (1988). We therefore are bound by the district court's adoption of the special master's determination of liability, which in turn was adequately supported by testimony concerning the specific policies and the prior conduct of Mentor and the Domestic Reinsurers in implementing the reinsurance contract at issue.
 
 III. Compensatory Damages
 A. Joint and Several Liability
 
 64
 The July 20, 1992 order awarded compensatory damages in the amount of $617,500 to be paid by the Domestic Reinsurers jointly and severally. The special master's initial recommendation had been that the Domestic Reinsurers pay Mentor "as specified in the Stipulated Order of Reference." Thereafter, Mentor proposed an order imposing such liability on a joint and several basis. The Domestic Reinsurers' objection was referred to the special master, who recommended that liability be joint and several, and the district court adopted the same view.
 
 
 65
 According to the Domestic Reinsurers, joint and several liability (a) is incompatible with the Stipulated Order of Reference, which expressly provides for the apportionment of compensatory damages; (b) is contrary to established insurance practice; and (c) is particularly arbitrary as it applies to AIG, which subscribed to none of the risk. Mentor asserts, inter alia, that the apportionment of damages set forth in the Order of Reference merely provides the Domestic Reinsurers with the ability to obtain contribution from each other.
 
 
 66
 We need not explore each of the arguments asserted by Mentor and the Domestic Reinsurers. Paragraph "10" of the Stipulated Order of Reference provides, in dispositive part:
 
 
 67
 Should the Special Master find Defendants liable under the Cover Note for the subject reinsurance risk, compensatory damages from each of the answering Defendants have been agreed upon by the parties as follows:
 
 
 68
 New Hampshire Ins. Co. $190,000.00
 American Home Ins. Co. 95,000.00
 National Union Fire Ins. Co. 95,000.00
 American Re"Insurance Co. 237,500.00
 -----------
 Total: $617,500.00
 -----------
 -----------
 
 
 69
 The awarding of any interest and/or such other and further relief apart from the aforesaid compensatory damages shall be in the discretion of the Special Master.
 
 
 70
 This stipulation controls the compensatory damages owing from each of the Domestic Reinsurers and precludes joint and several liability. AIG owes no compensatory damages because the stipulation provides for none.B. The Domestic Reinsurers' Motion for Leave to Amend
 
 
 71
 In October 1989, four and a half years after serving their answers in the action and one year before the parties signed the Stipulated Order of Reference, the Domestic Reinsurers sought to amend their answers to assert in a "Fourth Affirmative Defense" that Mentor's claims "must be reduced pro tanto by any amount which [Mentor] actually received or [was] entitled to receive" by way of subrogation. In compliance with the district judge's individual rules, the Domestic Reinsurers sought permission to make that motion. The March 16, 1990 order denied that application. The effect of that order was to deny a motion for leave to amend without any justifying reason. "[O]utright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).
 
 
 72
 No remand is required under the circumstances of this case, however, since the proposed amendment seeks only to readjust the compensatory damages in this action, as the Domestic Reinsurers admit, and is therefore facially incompatible with the Stipulated Order of Reference. At the June 19, 1991 hearing before Special Master Crittenden, counsel for the Domestic Reinsurers conceded that the proposed defense was fundamentally an issue of damages:
 
 
 73
 Really, I'm not sure this was an issue that should have been raised as an affirmative defense in the first place. It goes to the question of damages, simply a question of what were Mentor's damages. We don't really know whether Mentor, in fact, received any of the monies. If they did, clearly there will be an injustice if they received money and we're not allowed to put in evidence that we are entitled to a setoff about it. Mentor may be receiving a windfall here. That's the crux of Plaintiff's counsel argument here.
 
 
 74
 The brief submitted on appeal by the Domestic Reinsurers confirms that their proposed defense concerns the proper amount of compensatory damages:
 
 
 75
 Defendants were ... precluded from arguing that Plaintiffs should have been credited with their pro rata share of the subrogation efforts, which directly affects what Plaintiffs are entitled to recover under the TLO reinsur[ance], assuming a proper claim could be made under the TLO policy.
 
 
 76
 (Emphasis added.) In their reply brief, the Domestic Reinsurers add:
 
 
 77
 [T]he payment of any TLO reinsurance claim under this policy was, by definition, an all-or-nothing event. However, that does not mean that the liability of the TLO reinsurers would not subsequently be reduced by the amount of any recovery received by the Mentor Companies by way of subrogation.
 
 
 78
 (Emphasis added.)
 
 
 79
 The Order of Reference is unambiguous: it fixes the amount of compensatory damages each reinsurer will pay "[s]hould the Special Master find Defendants liable under the Cover Note for the subject reinsurance risk." In their brief, the Domestic Reinsurers state that the Order of Reference contains an "express apportionment of the compensatory damages." The Domestic Reinsurers entered into that stipulation well after they became aware of the grounds for their "Fourth Affirmative Defense" and after the district court denied them permission to amend their answers. Although the Order of Reference gives the special master latitude to award interest and further relief apart from compensatory damages, the Order of Reference nowhere contemplates that the compensatory damages should be or could be reduced to reflect subrogation. There are no unresolved issues of fact as to compensatory damages.
 
 
 80
 Regardless of the viability of the Domestic Reinsurers' "Fourth Affirmative Defense" at the time the district court refused to hear the motion in March 1990, and regardless of any rights the Domestic Reinsurers may have or may acquire to pursue subrogation in some other proceeding, the Domestic Reinsurers expressly and unambiguously waived their right to challenge the dollar amount of compensatory damages owing to Mentor in this lawsuit. Since the amendment the Domestic Reinsurers seek would therefore prove futile, it would be pointless to remand to the district court for a ruling on the merits of the motion to amend.
 
 IV. Pre-Judgment Interest
 
 81
 The Stipulated Order of Reference confers discretion on the special master to award interest. On appeal, the Domestic Reinsurers contest the district court's adoption of the special master's recommendation of pre-judgment interest at the rate of nine percent to be compounded annually. Mentor demonstrated that the nine percent rate falls between the average rate of return for three-month treasury bills and the average prime rate over the relevant period.
 
 
 82
 It is firmly established that "[a]llowance of pre-judgment interest in admiralty [actions] ... should be granted in the absence of exceptional circumstances," Mitsui & Co. v. American Export Lines, Inc., 636 F.2d 807, 823 (2d Cir.1981), and that the rate of pre-judgment interest is within the broad discretion of the district court. See Independent Bulk Transport, Inc. v. Vessel "Morania Abaco", 676 F.2d 23, 27 (2d Cir.1982). The Domestic Reinsurers, however, claim that the award of pre-judgment interest against them was in error, arguing (1) that this Court's decision in Independent Bulk Transport establishes that a district court abuses its discretion when it calculates interest on any basis other than the average three-month treasury bill rate; and (2) that there is no basis for annual compounding.
 
 
 83
 In Independent Bulk Transport we ruled that a prevailing party is not entitled to a calculation of pre-judgment interest at the interest rates at which it actually borrowed money during the period in question since "[c]onsideration of the precise credit circumstances of the victim would inject a needless variable into these cases." 676 F.2d at 27. Therefore, we affirmed the district court's use of an interest rate that awarded the prevailing party "the income which the monetary damages would have earned ... [as] measured by interest on short-term, risk-free obligations." Id. We did not endorse any particular rate of pre-judgment interest; nor did we hold that a court may not, in its broad discretion, award pre-judgment interest at a rate that reflects the cost of borrowing money, if measured for example by the average prime rate or adjusted prime rate rather than by actually paid rates. Accord Bally, Inc. v. M.V. "Zim America", No. 91 Civ. 5501, 1993 WL 33466, at * 8, 1993 U.S.Dist. LEXIS 926, at * 23 (S.D.N.Y. Feb. 1, 1993) (prejudgment interest award measured by prime rate); Nittetsu Shoji America, Inc. v. M.V. "Crystal King", No. 90 Civ. 2082, 1992 WL 116430, at *12-13, 1992 U.S.Dist. LEXIS 7615, at *43-45 (S.D.N.Y. May 21, 1992) (discussing varying methods of calculating pre-judgment interest). Cf. EEOC v. County of Erie, 751 F.2d 79, 81 (2d Cir.1984) (affirming district court's application of adjusted prime rate in cases brought under the Fair Labor Standards Act and the Equal Pay Act). We believe that the district court properly exercised its broad discretion when it adopted the special master's recommendation to apply the nine percent rate. The award of compound interest also was within the district court's broad discretion. See China Union Lines, Ltd. v. American Marine Underwriters, Inc., 755 F.2d 26, 30-31 (2d Cir.1985).
 
 V. Attorneys Fees
 
 84
 The July 20, 1992 order awarded $551,695.12, payable by each of the Domestic Reinsurers, in respect of attorneys fees and litigation expenses incurred by Mentor in prosecuting this action and in prosecuting a separate collection action against the Foreign Reinsurers whose initial payments of the CTL claim were escrowed by Leeds when AIG contested coverage. The district court ruled that the award was appropriate because:
 
 
 85
 Defendants had and have no valid reasonable basis in fact or law for Defendants' failure to honor the reinsurance loss that was properly ceded to them and because Defendants, A.I.G. OIL RIG, INC., NEW HAMPSHIRE INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, NATIONAL UNION FIRE INSURANCE COMPANY, and AMERICAN REINSURANCE COMPANY, breached the principle of utmost good faith to Plaintiffs.
 
 
 86
 The record, however, does not show the basis of the award. Mentor suggests that the award was granted as a form of compensatory damages for the Domestic Reinsurers' breach of the reinsurance contract. For example, Mentor argues that the Domestic Reinsurers should pay the legal fees incurred by Mentor in pursuing the Foreign Reinsurers because that separate coverage suit was a direct and foreseeable consequence of the lead reinsurers' breach. We disagree. Whatever merit such a theory would otherwise have, compensatory damages have been fixed in this action by stipulation of the parties. Accordingly, the remainder of the award, to the extent it is compensatory, must likewise be vacated.
 
 
 87
 Mentor also suggests that the award was granted as a result of the Domestic Reinsurers' bad faith.[2] This Court, however, has not been presented with factual findings sufficient to uphold an award of attorneys fees on that basis. The terms of the award, however, suggest that it was not premised on findings of bad faith. For example, the award applies to each of the Domestic Reinsurers; yet AIG assumed none of the ceded risk, owes Mentor no compensatory damages, and properly defended itself in this litigation on that basis. Furthermore, Mentor acknowledges (a) that American Reinsurance Company's failure to pay the reinsurance claim was the result of American Reinsurance Company's having followed AIG's lead in denying coverage; and (b) that following a lead reinsurer is customary (or so Mentor says when it argues that the leads should pay all fees incurred by Mentor in collecting from the Foreign Reinsurers).
 
 
 88
 Although we find no error in the conclusions that the Domestic Reinsurers failed to act in "utmost good faith" and "had and have no valid reasonable basis in fact or law for [their] failure to honor the reinsurance loss", it does not necessarily follow that the Domestic Reinsurers' conduct is, in essence, sanctionable. Thus, the district court's award of fees, if imposed in the form of equitable relief, relies on factual determinations that are not in the record and that this Court is not empowered to make. Similarly, this Court will not speculate as to whether the award is appropriate under any other theory that has not been stated by the district court or adduced by the parties. Accordingly, we must remand the issue of attorneys fees and litigation expenses to the district court. See Inverness Corp. v. Whitehall Laboratories, 819 F.2d 48, 51 (2d Cir.1987) (where appellate court can only speculate as to how the district court resolved certain material issues, the only appropriate procedure is to remand the case). If the district court determines on remand that its award of attorneys fees and litigation expenses stems from the bad faith of one or more of the Domestic Reinsurers, or is appropriate on some other basis, it should specify which reinsurer is required to pay and provide the findings and conclusions necessary to support such a judgment against each such reinsurer. Otherwise, the award of attorneys fees and litigation expenses is vacated; the well settled general rule is that a prevailing party in federal litigation is not entitled to recover attorneys fees or litigation expenses. Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975).
 
 
 89
 We have considered the remaining challenges of the Domestic Reinsurers to the fee award and, to the extent they raise issues that are not addressed herein and that may remain contested after the district court reviews the case on remand, have found them to be without merit. As to Mentor's request for double costs and attorneys fees pursuant to Federal Rule of Appellate Procedure 38, we find that the Domestic Reinsurers' appeal was not frivolous and therefore deny such relief. Our ruling in this regard obviates any need to discuss the district court's order of prospective appellate fees and expenses.
 
 CONCLUSION
 
 90
 The district court's July 20, 1992 order, insofar as it adopts the special master's finding that Mentor's claim is covered under the reinsurance contract, is affirmed. That part of the July 20, 1992 order awarding joint and several liability is reversed and remanded for an award consistent with the terms of the Stipulated Order of Reference. That part of the July 20, 1992 order awarding Mentor attorneys fees and litigation expenses is vacated and remanded to the district court for an order consistent with this opinion. The amount of interest owing shall be recalculated accordingly. Defendants Norges Brannkasse, Skandia Insurance Company, Rhone Mediterranee, Assurance Generales, Ancienne Mutuell Accident and Transatlantishe are dismissed. Mentor's Rule 38 request for costs is denied.
 
 
 
 [1]
 ODECO denies that it was bullied into accepting a CTL. Mr. Tucker Couvillon, a member of ODECO's legal department, testified: "I think the point at which ODECO agreed to treating this loss as a CTL was ... when all of the various problems in this claim were pulled together and we negotiated out a settlement which resulted in the rig being declared a CTL, which, definition[al]ly under the policy, it clearly was at that point."
 
 
 [2]
 "[T]he general rule is that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith." Ingersoll Milling Machine Co. v. M/V Bodena, 829 F.2d 293, 309 (2d Cir.1987) (citing Seguros Banvenez, S.A. v. S/S Oliver Drescher, 761 F.2d 855, 861-62 (2d Cir.1985)), cert. denied, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). See also Vaughan v. Atkinson, 369 U.S. 527, 530-31, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962) (award of costs in admiralty action found appropriate where losing parties were "callous in their attitude, making no investigation of libellant's claim.... [L]ibellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old," and where the "default was willful and persistent")