CONSOLIDATED CORK CORPORATION, Plaintiff,

v.

JUGOSLAVENSKA LINIJSKA PLOVIDBA, International Terminal Operating Co., Inc., and the M.V. SLOVENIJA, her engines, boilers, etc., Defendants.

No. 65 Ad. 912.

United States District Court,
S. D. New York.

Oct. 22, 1970.

Troy & Wallace, by James B. Wallace, Jr., New York City, for plaintiff.

Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, by Robert J. Giuffra, New York City, for defendants Jugoslavenska Linijska Plovidba and M. V. Slovenija.

Hill, Betts, Yamaoka, Freehill & Longcope, by Robert W. Mullen, New York City, for defendant International Terminal Operating Co., Inc.

CANNELLA, District Judge.

On Tuesday, November 26, 1963, the M. V. Slovenija of the defendant Jugoslavenska Linijska Plovidba [hereinafter "JLP"] docked at Pier 2, Erie Basin, Brooklyn, New York with 1,731 bales of

cork waste from Portugal consigned per two bills of lading[1] to the plaintiff New York corporation.

The plaintiff had sold the cork to the Dependable Cork Company [hereinafter "Dependable"] in Whippany, New Jersey where the bales, upon receipt, were broken open, one at a time, with the cork shavings and curlings being placed in a grinder. After multi-stage grinding, a binder was added to the cork, which was then compressed into cylinders three feet in diameter and four feet long, baked and left to cool for one week. Once a cylinder cooled, a cork sheet uniform in texture, strength and light coloration was to be peeled off for use as tack or bulletin boards. However, some eight days and 513 bales after the above process had been started at Dependable, a peeling of the first cool cylinder(s) resulted in tearing and sheets which were stained and discolored. Dependable's president Herman testified, and the court so finds, that this condition was caused by water[2] having seeped into the bales and wetted the cork, thereby making it unsuitable for its intended use. Dependable therefore returned the remaining 1,218 bales to the plaintiff.

The plaintiff subsequently filed its libel against JLP and its stevedore, the International Terminal Operating Co. [hereinafter "ITO"]. In answering the libel on November 4, 1965, JLP cross-claimed against ITO, allegedly pursuant to then local Admiralty Rule XVII of the Court.

■ While there is no question that this Court has admiralty jurisdiction over JLP, ITO has moved to dismiss plaintiff's claim against it for lack of such jurisdiction. The plaintiff argues quite typically in opposition to this motion that "admiralty still retains an aura of equity which overcomes technicalities."[3] The technicality here, of course, is that there is no admiralty jurisdiction over plaintiff's direct claim against ITO, but, on the other hand, it is by no means clear that practicality would not supplant technicality in a case such as this in the Second Circuit.[4] While the plaintiff has not followed through with its offer to "approach the court with a list of citations setting forth [this] position in chapter and verse,"[5] the court refers, for example, to the opinion in the Court of Appeals of Judge Kaufman in David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295, 300 (2d Cir. 1964). The case at bar is not one where independent jurisdictional grounds exist. Cf. Christman v. Maristella Compania Naviera, 293 F.Supp. 442 (S.D.N.Y.1968). However, the court is aware of the procedure available in 1965 to a respondent in admiralty under Admiralty Rule 56 [now essentially Rule 14(c) of the Federal Rules of Civil Procedure (FRCivP)] and also that in a case tried and recently decided by this court,[6] the same JLP was the respondent, and it impleaded ITO pursuant to Rule 56 on the very day— November 4, 1965—on which it filed its answer and cross-claim herein. Clearly, this procedure through which admiralty jurisdiction is retained over a matter involving the same transaction or occurrence could have and would have been invoked by JLP in this case but for plaintiff's libel. Therefore, the court will decide this case as if admiralty jurisdiction had been acquired over ITO through the usual third-party procedure.

\* \* \*

■■ The court finds that plaintiff's cargo was in the same unexceptionable condition at the time of unloading as

---

1. See plaintiff's Exhibits 3 and 4.

2. A silver nitrate test showed that it was fresh, and not salt, water which caused the damage.

3. Plaintiff's Post-Trial Memorandum, p. 15.

4. The court notes that the Fifth Circuit of Appeals has recently sustained admiralty jurisdiction over a claim subjected to a jurisditional challenge similar to that of ITO. See Watz v. Zapata Off-Shore Co., 431 F.2d 700 (5th Cir. Sept. 1, 1970, rehearing denied, Oct. 7, 1970).

5. Supra note 3 at 15–16.

6. Louis Furth, Inc. v. S.S. Srbija, Docket No. 65 Ad. 647 (S.D.N.Y. Sept. 4, 1970).

when lifted in Portugal[7] and that all of the cork bales covered by the two "clean" bills of lading were off-loaded at Pier 2, a fit and customary wharf. There was thus a "proper delivery" within the meaning of the Harter Act, 46 U.S.C. § 190. See generally Caterpillar Overseas, S. A. v. S. S. Expeditor, 318 F.2d 720 (2d Cir.), cert. denied sub nom. American Export Lines, Inc. v. Caterpillar Overseas, S. A., 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963). Once there is such a proper delivery, neither Harter nor the Carriage of Goods By Sea Act, 46 U.S.C. § 1300 et seq., is applicable, and the carrier's duties are those of a bailee or warehouseman as set forth in the *Crystal* case, 223 F.Supp. 273 (S. D.N.Y.1963), aff'd, 339 F.2d 295, cert. denied, 380 U.S. 976, 85 S.Ct. 1339, 1340, 14 L.Ed.2d 271 (1965).

■ In searching in *Crystal* for the standard by which a carrier is to be judged for a misdelivery of cargo after the termination of the contract of carriage, Judge Levet pointed out that "unquestionably * * * the duty of a carrier, as warehouseman, is to exercise ordinary care for the protection of the goods." 223 F.Supp. at 283. Thus, in order for the plaintiff to recover for the damage to the bales of cork, it must show negligence on the part of the carrier or on the part of anyone the carrier has entrusted the cargo to. See N.Y.Gen.Bus. Law § 91;[8] Union Marine & General Ins. Co. v. American Export Lines, Inc., 274 F.Supp. 123 (S.D.N.Y.1966). See also The Italia, 187 F. 113 (2d Cir. 1911); Isthmian Steamship Co. v California Spray-Chemical Corp, 290 F.2d 486 (9th Cir. 1961), aff'd on rehearing, 300 F.2d 41 (9th Cir. 1962).

■ The court finds that the carrier, JLP, was not itself negligent, but that the actions of ITO subsequent to the unloading of the bales constituted negligence for which JLP is liable. Neither JLP nor ITO had been given specific instruction prior to, or at the time of, unloading with regard to storage of the cork. Furthermore, the bales themselves were not marked with any storage directions. ITO personnel, apparently as a matter of convenience during unloading, placed part of plaintiff's consignment under cover on the pier, while the rest of the bales were placed in the open farm area. However, when plaintiff's supervisor and inspector of its cork shipments saw the cork stacked in the farm area, he told ITO's pier superintendent that the entire shipment was to be kept under cover whereupon those bales left in the open were covered by ITO men with tarpaulins. Plaintiff's inspector, Licitra, testified, and the court so finds, that these bales were covered in this manner when he left the pier on Thursday, November 28, 1963, but that when he returned to the pier on Sunday, December 1st, he discovered that the tarpaulins had become loose and pulled apart. The court finds that ITO's failure to make the tarpaulins properly fast (or to cover the bales in some other efficacious manner) was negligence on its part and that this negligence caused the bales to become wet.[9] Licitra's testimony that he saw some 8–10 inches of melting snow covering the stack is disputed, but the court concludes that whatever the precise nature of the precipitation on November 29th–30th, it was more than enough to, and did in fact, soak the exposed bales. The Weather Bureau's Local Climatological Data sheet compiled at the Cen-

---

7. For the controlling law on good delivery and outturn of an ocean cargo, see generally M. W. Zack Metal Company v. S.S. Birmingham City, 311 F.2d 334 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963).

8. Superseded Sept. 27, 1964 by N.Y.U.C.C. § 7-204. This Section 7-204 represents, however, little more than a slight rewording of the liability of a warehouseman un-

der Section 107 of the General Business Law which was applicable at the time of the damage complained of in this case. See, e. g., Comment, Damages as a Remedy for Commercial Negligence, 31 Fordham L.Rev. 767, 778–82 (1963).

9. There is no evidence before the court tending to show that the wetting occurred at any other time.

tral Park Observatory shows a total, water-equivalent precipitation for those two days of 2.05 inches.[10]

■ With regard to JLP's claim against ITO, whether liability is predicated upon breach of an implied warranty of workmanlike service or whether it is the liability of a bailee,[11] the negligence in this case was ITO's, and liability "should properly fall upon the party who is best situated to adopt protective measures." David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d at 299. JLP's claim is therefore allowed against ITO.

\* \* \*

■■ The only issue of those listed in the Pre-Trial Order which remains to be determined is the amount[12] of plaintiff's damages, a question of considerable difficulty which the parties unfortunately have not briefed. This difficulty stems, of course, from the unique facts in this case. The exact number of bales that became wet as a result of ITO's negligence, for example, would have been difficult to determine and was in fact never determined at the time

of the occurrence or at any other time including the trial, but, on the other hand, the evidence indicates and the court finds that whatever this number, it did not nearly approach 1,731.[13] What saves plaintiff's claim then from dismissal on the ground of failure of proof is the uniqueness of the cargo and its intended use which made the transaction between the plaintiff and Dependable that of a special manufacturer within the meaning of Section 85 of the Personal Property Law then applicable in New York and Section 2–201 of the Uniform Commercial Code, which had already gone into effect in New Jersey. While Dependable's right to reject cork is not specifically at issue in this case, the court finds that the wetting of some of the bales substantially impaired the value of the entire consignment of cork to Dependable and that the difficulty of discovery of this impairment (breach of warranty) by Dependable was such as to all but require the processing of the 513 bales, including those which had not become wet as a result of ITO's negligence. See N.J.S.A. 12A:2–608. Cf.

---

10. See JLP Exhibit A, which summarizes November, 1963 as the "second wettest month on record since 1869."

Appended to JLP's Post-Trial Memorandum is a copy of the weather observation sheet for "N.Y. Ave V Bklyn" which lists 2.02 inches of precipitation for the Friday and Saturday in point and contains remarks to the effect that significant stormy weather was observed on those two days.

11. Compare the opinions of Judge Levet and Judge Kaufman in *Crystal* with that of Judge Anderson.

12. The plaintiff claims $8,983.45.

13. By November 27th, a total of 250 bales had been transported by truck to Dependable, and thus these bales obviously were not damaged as a result of ITO's negligence. See plaintiff's Exhibit 2; JLP's Exhibit B.

Plaintiff's Exhibit 2, a letter from Licitra to the plaintiff dated November 27, 1963 reads, in part:

In line with instructions, 4 truck loads or about 500 bales are to be trucked to

Whippany, with the balance of these curlings to go via Erie-Lackawanna-closed lighter.

At this writing, Ventry has trucked 1 load of 121 bales curlings on 11/26/63—P.M.—and 1 load of 129 bales on 11/27/63—A.M.—for a total of 250 bales to Whippany. All of this material is being stored outside with some covering and a promise of total covering at the first signs of rain or snow.

This letter could obviously be interpreted to mean that the only bales stored in the open farm area were those to be transported by truck, especially in view of the undisputed testimony of ITO's supervisor at Pier 2, Grisanzio, that "most" of the bales were under cover on the pier. JLP's Exhibit B indicates that some 266 bales were taken by truck to Whippany on Monday, December 2nd, with essentially all of the remaining bales being transported thereafter by lighter and rail. The 513 bales processed by Dependable were all delivered by truck.

N.Y. Property Law § 150 (superseded Sept. 27, 1964).

This difficulty of discovery does not apply to the plaintiff, however. The plaintiff, through its agent Licitra, had notice that bales had become wet and were therefore not in conformity with contractual requirements *prior* to their removal from the pier and thus prior to processing by Dependable. The plaintiff therefore cannot recover the costs incurred as a result of its having shipped cork which was subject to rejection (and which was rejected) by the buyer,[14] nor can it recover the "manufacturing loss" credit it extended to Dependable.[15] But the plaintiff is entitled to recover the freight paid to truck the first 250 bales,[16] the cost of storing [17] the rejected bales until they were sold at salvage and the cost differential [18] in supplying Dependable in the meantime with other suitable cork. Plaintiff's total recoverable damages in this case then are the sum of these three items plus the total cost and freight [19] of the bales from Portugal less both the net sum realized through salvage [20] and the calculated sale price [21] of the 513 bales to Dependable or $5,638.76.

\* \* \*

All motions, decision of which was reserved at the time of trial, are hereby denied [22] in conformity with this opinion which represents the court's findings of fact and conclusions of law pursuant to Rule 52, FRCivP. The parties are directed to settle an order within ten days providing for judgment for the plaintiff as against JLP in the amount of $5,638.-76 plus interest and for judgment for JLP as against ITO in the identical amount.

So ordered.

---

14. These expenses include: (1) The rail and truck freights for transporting the rejected bales from Brooklyn to Whippany and back. See plaintiff's Exhibits 9, 14, 15, 16. (2) The cost of labor for unloading and reloading at Whippany. (3) The costs incurred in attempting to dry the bales *after* their return.

15. This loss was calculated as $50.00 times the 25 cylinders manufactured or $1250.00. See plaintiff's Exhibit 8C.

16. On an average weight per bale basis, the court has calculated this freight to be $236.78. See plaintiff's Exhibit 14.

17. The court finds that the rail demurrage costs in the total amount of $672.00 represent a storage expenditure. See plaintiff's Exhibit 17.

18. This differential is listed as $220.36 in the Pre-Trial Order. Cf. plaintiff's Exhibit 18.

19. $13,650.00. See plaintiff's Exhibits 8A, 8B, 12, 13.

20. $5,050.74. See plaintiff's Exhibit 6.

21. $4,089.64. See plaintiff's Exhibit 8C.

22. JLP's application for leave to submit evidence on the amount of attorney's fees is denied.