**HARTFORD FIRE INSURANCE COM-PANY, Viva Trade Corporation, and International Sales Inc., Plaintiffs,**

v.

**NOVOCARGO USA INC., DSR Senator Lines, DSR Senator Lines GmbH, United Arab Shipping Co. (S.A.G.), Sirius Navigation Corp., in personas, and m/v "Pacific Senator," her engines, tackle, boilers, etc., in rem., Defendants.**

Novocargo USA, Inc., Third–Party Plaintiff,

v.

Global Terminal & Container Services, Inc. and Reederei Hansescan GmbH, Third–Party Defendants.

United Arab Shipping Co. (S.A.G.), Third–Party Plaintiff,

v.

Casan Colomar, S.A., Third–Party Defendant.

No. 01 Civ. 0094(WHP).

United States District Court, S.D. New York.

March 31, 2003.

---

David L. Mazaroli, Law Offices of David L. Mazaroli, New York, New York, for Plaintiff.

John Hay McConnell, Purrington & McConnell, New York, New York, for Defendant Novocargo USA Inc.

Kevin Foley, Cichanowicz, Callan, Keane, Vengrow & Textor, New York, New York, for Defendant DSR Senator Lines GmbH.

Robert A. Milana, London Fischer LLP, New York, New York, for Defendant United Arab Shipping Co.

John R. Geraghty, Geraghty Law Firm, Hackensack, New Jersey, for Third–Party Defendant Global Terminal & Container Services, Inc.

*OPINION & ORDER*

PAULEY, District Judge.

In this multi-party admiralty action, plaintiffs seek to recover damages caused to a shipment of furniture during and after a voyage from Valencia, Spain to the Port of New York. Plaintiffs assert that the cargo was damaged when an aircraft tow tractor fell on the container carrying the cargo during a storm at sea, and sustained further damage as a result of post discharge exposure and devanning. After a one day bench trial and consideration of the parties' voluminous post-trial submissions, this Court finds that: (1) defendants Novocargo USA Inc. ("Novocargo") and Senator Lines GmbH ("Senator") are jointly and severally liable to plaintiffs for the damage to the cargo caused by the aircraft tow tractor; (2) third-party defen-

dant Global Terminal & Container Services, Inc. ("Global") is directly liable to plaintiffs for all post-discharge damage; (3) Novocargo is entitled to full indemnity from Senator; and (4) Senator is entitled to full indemnity from defendant United Arab Shipping Co. (S.A.G.) ("United Arab").

### FINDINGS OF FACT

This Opinion and Order presumes familiarity with this Court's prior decisions in this action. *See Hartford Fire Ins. Co. v. Novocargo USA Inc.*, No. 01 Civ. 94(WHP), 2002 WL 10543 (S.D.N.Y. Jan.3, 2002); *Hartford Fire Ins. Co. v. Novocargo USA Inc.*, 156 F.Supp.2d 372 (S.D.N.Y. 2001).

### I. *The Parties*

Plaintiff Hartford Fire Insurance Co. ("Hartford") is the subrogated insurer of the cargo in suit. (Stipulated Facts, contained in the Joint Pre–Trial Order dated November 19, 2001, at 10–13 ("Stip.") ¶ 1.) Plaintiffs Viva Trade Corporation and International Furniture Sales Inc. (collectively, "Viva") are the consignees, purchasers and owners of the cargo at issue. (Stip.¶ 2.) Novocargo is a non-vessel owning common carrier ("NVOCC") engaged in the business of common carriage of cargo for hire. (Stip. ¶ 3; Trial Transcript dated April 8, 2002 ("Tr.") at 64.) Senator, sued under its former name, DSR Senator Lines GmbH, is a German corporation engaged in the business of common carriage of cargo for hire. (Stip.¶ 4.) United Arab is a corporation engaged in the business of carriage of cargo for hire. (Stip.¶ 5.) Global is a stevedore with an outdoor storage facility in New Jersey. (Stip.¶ 6.)

Novocargo tendered the defense of this action to Senator on January 12, 2001 and several times thereafter. (Defendants' Trial Exhibits ("Def.Exs.") N–O, N–P, N–Q.) Senator answered the complaint and asserted cross-claims against Novocargo and another defendant, later voluntarily dismissed from this action. United Arab Shipping answered and asserted a cross-claim against Senator and a third-party complaint against Casan Colomar, S.A. ("Casan Colomar"). Novocargo filed a third-party complaint against Global.

### II. *The Voyage Of The M/V PACIFIC SENATOR*

In December 1999, three different lots of Spanish applewood furniture were consolidated at the Port of Valencia and consigned to Viva. (Stip. ¶ 2; Plaintiff's Trial Exhibit ("Pl.Ex.") 3.) On or about January 3, 2000, Novocargo contracted with Viva to ship that specialty furniture from Valencia to the Port of New York. (Stip.¶ 7.) Novocargo issued three bills of lading for the cargo to Viva, and subcontracted the ocean carriage to Senator. (Stip.¶ 7, 8.) Senator issued a sea waybill to Novocargo for the furniture on or about January 4, 2000.[1] (Stip.¶ 8.)

Viva's cargo was loaded aboard the M/V PACIFIC SENATOR, a container ship time chartered by Senator at the Port of Valencia. (Stip.¶ 9.) Fatefully, a 21–ton aircraft tow tractor (the "aircraft tractor"), en route from Abu Dhabi to New York through Valencia, was also loaded in the hold of the M/V PACIFIC SENATOR. (Tr. at 87–89; Def. Exs. S–F at 2, S–G at 4–5, U–H.) The aircraft tractor had been rejected for unseaworthy lashing several days earlier from carriage on board the M/V CALIFORNIA SENATOR. (Tr. at 89; Def. Exs. U–D, U–N.) During the "Millennium" celebrations surrounding the

---

**1.** A sea waybill is simply another term for a bill of lading. *Jessica Howard Ltd. v. Norfolk* *S. R.R. Co.*, 316 F.3d 165, 169 n. 1 (2d Cir. 2003).

2000 New Year, the aircraft tractor was relashed to a flatrack container by Casan Colomar at the direction of Roca Monzo, S.A. ("Roca Monzo"), United Arab's agent in Valencia.[2] (Tr. at 87; Def. Exs. U–D, U–E, U–R.) Roca Monzo paid Casan Colomar for the relashing, and in turn re-billed its "principals," United Arab, for the entire amount. (Tr. at 98.) After relashing, the aircraft tractor was accepted on board the M/V PACIFIC SENATOR under a bill of lading issued by United Arab pursuant to United Arab's slot charter agreement with Senator. (Stip. ¶ 22; Tr. at 89; Def. Exs. U–D, U–E, U–R.)

United Arab's slot charter agreement with Senator was governed by two interrelated contracts, the Master Agreement (Def.Ex. UM) and the slot charter (Def.Ex. S–E) (collectively, the "slot charter agreement"). Article 16 of the Master Agreement, titled "Charterer's Responsibilities And Liabilities," provides in relevant part:

> [United Arab] shall be responsible for the proper and careful loading, stowage, lashing and securing of the goods in the containers offered by them for shipment and shall be liable for all loss or damage (including loss of or damage to the vessel) caused to [Senator] as a result of improper or careless performance of such operations.
>
> \*   \*   \*   \*   \*   \*
>
> [United Arab] shall indemnify and hold harmless [Senator] for damage to property, death, injury or illness resulting from misdescription of goods, improper stowage of goods within containers, or defect in the construction of the containers tendered by [United Arab] to [Senator].

**2.** A flatrack is an open-sided, open-topped container with front and rear walls or stanchions that "provide a capability for container ships to carry oversized cargo and wheeled and tracked vehicles." Joint Publication 1–

(Def.Ex. U–M.) Clause 5.1.12 of the slot charter agreement provides in relevant part:

> [United Arab] shall indemnify and hold harmless [Senator] from any loss, damage, death or injuries including any fine, penalty, or duties and expenses arising out of or in connection with the act or omission of [United Arab], or its agent, sub-contractors or employees including but not limited to … improper stowage of goods in the container, and defect of the goods or containers.

(Def.Ex. S–E.)

During the nine-day transatlantic voyage from Valencia to the Port of New York, the M/V PACIFIC SENATOR encountered wind/sea conditions of Beaufort Force 8/9, including significant swells that caused the vessel to roll up to 32 degrees. (Def. Ex. S–G at 3.) During that gale, the aircraft tractor broke free from its lashing and fell onto the container holding Viva's cargo, severely damaging both the container and the furniture. (Stip. ¶ 21; Def. Ex. S–G at 4.) The surveyor hired by United Arab reported that the aircraft tractor's lashing was "insufficient" because it used only two bulldog grips for each half-inch wire component, rather than the recommended three. (Def. Ex. N–R at 3.)

### III. *Discharge At Global's Facility*

The misadventure did not end with the M/V PACIFIC SENATOR's arrival at the Port of New York. On or about January 14, 2000, the start of the Martin Luther King Day holiday weekend, Senator discharged the damaged container at Global's one hundred acre outdoor storage facility

02, *Department Of Defense ("DOD") Dictionary of Military and Associated Terms* (as amended through January 9, 2003), *available at* http://www.dod.gov/pubs.

in New Jersey. (Stip. ¶ 10; Tr. at 103.) There, the damaged container was grounded on the pier tarmac and exposed to the vagaries of a New York winter. During the fortnight the container sat unprotected at Global's facility, meteorological records from the National Climatic Data Center reveal that nearby Newark Liberty International Airport experienced five snowstorms, freezing rain and temperatures as low as four degrees Fahrenheit. (Def.Ex. G–C.) At the time the container was discharged from the M/V PACIFIC SENATOR, Global was aware that the container's roof was breached and open to the weather. (Tr. at 103; Def. Exs. G–A, G–B, N–N.) Nevertheless, Global left the container without a tarpaulin to protect it until January 28, 2000, when the container was devanned. (Tr. at 104–05; Pl.Ex. 18 at 3–4; Def. Exs. G–A, G–C, N–I, S–G.)

Senator and Global operated under a terminal and stevedoring agreement which states in relevant part:

> The CONTRACTOR shall be liable for any damage caused by the negligence of CONTRACTOR, his servants, agents or subcontractors to the container vessel including its gear, all other equipment and cargo on board while the container vessel is berthed at the terminal.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> If CARRIERS in its capacity as carrier should be liable for any damage to and/or loss of cargo to the cargo owners or third parties, and if such damage is proven to have been caused to the cargo while in custody of the CONTRACTOR, and caused by the negligence or default of CONTRACTOR [Global], his servants, agents or subcontractors, then CONTRACTOR shall indemnify CARRIERS for any such liability to the full amount payable by CARRIERS plus survey fees and legal costs.

(Def. Ex. S–D ¶¶ 5.01–03.)

Graham Marine Associates ("Graham Marine") conducted a survey on behalf of Novocargo. (Stip.¶ 12.) It found that the container roof was pushed in, and that furniture cartons under those areas were crushed. (Tr. at 76; Def. Ex. N–I.) In addition, Graham Marine found an accumulation of ice and snow inside the container, and many of the bottom tier boxes had frozen to the container floor. (Tr. at 76–77; Def. Ex. N–I.) Global's employees used forklifts to pry the frozen cartons from the container, causing further damage. (Tr. at 77–78, 81–83; Pl. Exs. 9–10.) Apparently, Global never considered the possibility of waiting to remove the furniture until warmer temperatures melted the ice and snow. The following exchange between the Court and Novocargo's surveyor aptly summarizes stevedoring reality:

> THE COURT: Was there any reason that you couldn't just wait until the weather warmed a little bit so that the cartons weren't frozen to the floor?
>
> THE WITNESS: Usually we find that out when we open the door. Labor is organized and so on, and nobody is going to turn up and say, okay, we are going to stop this operation because of this. Labor is organized. It is set in motion.
>
> THE COURT: So you wouldn't just re-band the container at that point and wait for a warmer day?
>
> THE WITNESS: Not in our work, no, sir.

(Tr. at 83.)

Graham Marine concluded that the shipment was almost a total loss, with fifty-seven percent (57%) of the total damage attributable to the aircraft tractor's cata-

strophic impact, and forty-three percent (43%) attributable to post-discharge water and devanning damage. (Tr. at 77–79.) Viva presented an insurance claim to Hartford, and Hartford paid Viva $33,572.04. (Tr. at 30; Pl. Exs. 14–15.) Hartford and Viva commenced this action on January 5, 2001 as the subrogated insurer and purchasers of the cargo, respectively. (Stip.¶ 16.)

## IV. *Value of the Cargo and Payments*

The F.O.B. invoice value of the damaged cargo, *i.e.* Viva's purchase price, was $27,627.00. (Stip.¶ 17.) Viva paid Novocargo freight charges of $1,742.00. (Stip.¶ 18.) Viva accepted the few items of undamaged furniture that remained, with an invoice value of $1,196.10. (Stip.¶ 19.) After a joint inspection by surveyors for the respective parties, the balance of the damaged cargo was sold at salvage, for which Hartford received a check in the amount of $1,500. (Stip.¶ 20.) Plaintiffs incurred incidental expenses of $1,470.00 and survey fees of $1,303.03. (Pl.Exs.16–17.) Plaintiffs demonstrated that the intended resale value of the cargo, pursuant to pre-existing resale commitments and price lists, was $46,935.00. (Tr. at 25, 27–30, 60; Pl. Exs. 5–7.)

## CONCLUSIONS OF LAW

That at least some of the defendants in this case are liable to plaintiffs is not seriously challenged—the cargo in question was sound when loaded aboard the M/V PACIFIC SENATOR in Valencia, and was damaged to the point of near total loss upon inspection at Global's facility in New Jersey. The issues that remain to be decided, however, are the allocation of liability among the defendants, and the proper measure of plaintiffs' damages.

## I. *Pre–Discharge Liability*

The liability of Novocargo, as plaintiffs' NVOCC, and Senator, as the subcontracting carrier, is governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300–1315. COGSA governs the relationship between the parties to a bill of lading where that document is issued as the contract of carriage. 46 U.S.C.App. § 1300; 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* §§ 10–15 (3d Ed.2001). To determine the liability of carriers for loss or damage to cargo, COGSA employs a system of burden shifting. *Albany Ins. Co. v. M/V SEALAND URUGUAY,* No. 00 Civ. 3497(JSM), 2002 WL 1870289, at *1 (S.D.N.Y. Aug.13, 2002). First, a plaintiff shipper must establish a *prima facie* case against a carrier by showing that the cargo in suit was damaged while in the carrier's custody. *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration,* 137 F.3d 94, 98 (2d Cir.1998); *Caemint Food, Inc. v. Lloyd Brasileiro Companhia de Navegacao,* 647 F.2d 347, 351 (2d Cir. 1981); *R.B.K. Argentina, S.A. v. M/V Dr. Juan B. Alberdi,* 935 F.Supp. 358, 368 (S.D.N.Y.1996). This can be accomplished by showing that the cargo was delivered to the carrier in good condition but discharged in damaged condition. *Vana Trading Co., Inc. v. S.S. "Mette Skou",* 556 F.2d 100, 104 (2d Cir.1977); *Albany Ins. Co.,* 2002 WL 1870289, at *2.

If a shipper makes out a *prima facie* case, the burden then shifts to the carrier to show that the loss falls within one or more of the COGSA statutory exceptions. 46 U.S.C.App. § 1304; *accord Transatlantic Marine,* 137 F.3d at 98; *Associated Metals & Minerals Corp. v. S/S Jasmine,* 983 F.2d 410, 415 (2d Cir.1993); *Nissho–Iwai Co., Ltd. v. M/T Stolt Lion,* 719 F.2d 34, 38 (2d Cir.1983); *Albany Ins. Co.,* 2002 WL 1870289, at *2. If the carrier

can rely on one or more COGSA exceptions, "the burden return[s] to the plaintiff to show that the carrier's negligence contributed to the damage." *O'Connell Mach. Co. v. M.V. Americana,* 797 F.2d 1130, 1133 (2d Cir.1986); *accord J. Gerber & Co. v. S.S. Sabine Howaldt,* 437 F.2d 580, 588 (2d Cir.1971); *Lekas & Drivas, Inc. v. Goulandris,* 306 F.2d 426, 430 (2d Cir. 1962).

■ Plaintiffs' *prima facie* case of carrier liability is established by the stipulated facts in this case, and is not challenged. The parties stipulate that the cargo at issue was damaged during the voyage of the M/V PACIFIC SENATOR as a result of the aircraft tractor's impact. (Stip.¶ 21.) Further, neither Novocargo nor Senator assert that any COGSA statutory exception applies. (Novocargo's Post–Trial Mem. at 5; Senator's Post–Trial Mem. at 1.) Therefore, liability under COGSA is established in the first instance with respect to plaintiffs' NVOCC, Novocargo.

Liability is also established with respect to Senator, plaintiffs' subcontracting carrier. "[A] NVOCC is a common carrier with respect to the shippers who employ its services, but with respect to the vessel and her owner, the NVOCC is deemed an agent of the shipper." *Orion Ins. Co., PLC v. M/V Humacao,* 851 F.Supp. 575, 578 (S.D.N.Y.1994); *accord Ins. Co. of North America v. M/V Ocean Lynx,* 901 F.2d 934, 937 (11th Cir.1990); *Insurance Co. of North America v. S/S Am. Argosy,* 732 F.2d 299, 301 (2d Cir.1984); *Prusman Ltd. v. M/V Nathanel,* 670 F.Supp. 1141, 1143 (S.D.N.Y.1987). Therefore, under the law of agency, Senator is bound not only to Novocargo, an agent of the plaintiffs, but to plaintiffs themselves. *See Stolt Tank Containers, Inc. v. Evergreen Marine Corp.,* 962 F.2d 276, 280 (2d Cir. 1992) (permitting recovery by shipper on

bill of lading issued by ocean carrier to common carrier); *Orion Ins. Co.,* 851 F.Supp. at 578 (same); *cf. Castro v. Federal Ins. Co.,* 823 F.Supp. 132, 134 (S.D.N.Y.1993) (where an agent contracts with a third party on behalf of a partially disclosed principal, the third party is liable to the principal); *Orient Mid–East Lines v. Albert E. Bowen, Inc.,* 458 F.2d 572, 575 (2d Cir.1972) (where a third party has notice that an agent is acting for a principal, yet is unaware of the principal's identity, the principal is deemed partially disclosed).

Accordingly, Novocargo and Senator are jointly and severally liable for the damage to plaintiffs' cargo that occurred as a result of the aircraft tractor's impact during the voyage of the M/V PACIFIC SENATOR. *See Project Hope v. M/V IBN SINA,* 250 F.3d 67, 72 (2d Cir.2001) (in admiralty, joint and several liability is "a standard remedy in cases involving multiple tortfeasors"); *see also McDermott, Inc. v. AmClyde,* 511 U.S. 202, 220–21, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994) (noting that in admiralty "[j]oint and several liability applies when there has been a judgment against multiple defendants"); *The Atlas,* 93 U.S. 302, 317–19, 3 Otto 302, 23 L.Ed. 863 (1876) (adopting joint and several liability rule in admiralty); *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113, 1124–30 (5th Cir.1995) (en banc) ("joint and several liability is the maritime rule").

Graham Marine's survey determined that 57% of the damage to Viva's cargo was caused by the impact of the aircraft tractor. (Tr. at 77.) A surveyor's percentage estimate is an accepted method for determining damages in admiralty actions. *Interstate Steel Corp. v. S/S Crystal Gem,* 317 F.Supp. 112, 117, 121 (S.D.N.Y.1970) ("In determining the extent of [damages] and placing liability upon the appropriate tortfeasor, courts have often accepted both

the testimony of experts and their findings as embodied in marine surveys.... Indeed, costs of repairs may be estimated by an examination of only part of the damaged cargo and projections made from such representative samplings.") (collecting cases); *accord Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 540 (2d Cir.1994); *Macsteel Intern. USA Corp. v. M/V IBN ABDOUN*, 218 F.Supp.2d 480, 483 (S.D.N.Y.2002). Accordingly, Novocargo and Senator are jointly and severally liable for 57% of the total damage to the cargo.

## II. *Post–Discharge Liability*

■ With respect to the portion of the overall damage attributable to post-discharge events, Global is directly liable to plaintiffs. Although Global is not in privity with plaintiffs, a stevedore owes a direct duty of care to a shipper to perform its services in a workmanlike manner without instructions or inquiry. *See* 46 App.U.S.C. § 190 (Harter Act duty to care for cargo cannot be waived); *see also Stein Hall & Co. v. S.S. Concordia Viking*, 494 F.2d 287, 290 (2d Cir.1974) (affirming stevedore's liability based on breach of warranty of workmanlike service and common-law principles of bailment, holding that "once [the stevedore] took possession of the cargo, it became a bailee for the mutual benefit of the carrier and consignees"); *Andina Coffee v. M/V CUIDAD DE ARMENIA*, No. 87 Civ. 8337(MGC), 1989 WL 85887, at *3 (S.D.N.Y. July 27, 1989) (stevedore's Harter Act duty of care "non-waivable"); *Berisford Metals Corp. v. M/V Copiapo*, 653 F.Supp. 419, 422 (S.D.N.Y.1986) (discussing stevedore's "implied warranty of workmanlike service"). A stevedore's breach of this duty of care results in the stevedore's direct liability to the shipper. *See Andina Coffee*, 1989 WL 85887, at *3.

■ It is clear that the furniture sustained damage, separate from the damage caused by the aircraft tractor impact, as a result of exposure to rain, snow and ice while berthed at Global's terminal, as well as damage caused when the frozen cartons were "pried off" the container floor by Global's employees. (Tr. at 77–78.) Global's primary defense is that no party requested that it cover the damaged container with a tarpaulin, and that forklifts were the only tool it uses to devann containers. (Tr. at 13, 105–06.)

The fact that no party specifically requested a tarpaulin is irrelevant, since Global owes the cargo interests a duty of care which is breached by negligently allowing further damage to the cargo in its care. *See Consol. Cork Corp. v. Jugoslavenska Linijska Plovidba*, 318 F.Supp. 1209, 1212–13 (S.D.N.Y.1970) (finding breach of warranty of workmanlike service where stevedore, in the absence of instructions regarding storage, failed to properly cover with tarpaulins a cargo of cork, leading to water damage); *see also Stein Hall*, 494 F.2d at 290 ("The absolute obligation of the bailee is ... a duty to restore the property, or to account for it.") (quotation omitted). Global had no reason to believe that the cargo in the damaged containers was imputrescible, and therefore Global's failure to cover an obviously damaged container constituted a breach of a stevedore's duty of care. *See Consol. Cork*, 318 F.Supp. at 1212–13. In addition, Global breached its duty by allowing its workers to pry the frozen cartons from the container with forklifts. (Tr. at 77; Def. Ex. N–I.) Global could have waited until the ice melted before attempting to wrench the frozen boxes from their container. (Tr. at 82–83.) Accordingly, this Court finds that Global breached its duty of workmanlike performance, and, as a result, is liable for all post-discharge damage.

Graham Marine determined that post-discharge damage accounted for 43% of

the total damage to Viva's cargo. (Tr. at 79.) Therefore, pursuant to Rule 14(c) of the Federal Rules of Civil Procedure, Global is liable directly to plaintiffs for 43% of the total damages.[3]

### III. *Rights To Indemnification*

■ To the extent plaintiffs choose to recover from Novocargo, Novocargo is entitled to full indemnity from Senator. A right to indemnity exists between a vessel owner and charterer "when one is held liable for a fault for which the other is primarily liable." *Nissho–Iwai,* 617 F.2d at 913; *accord Iligan Integrated Steel Mills, Inc. v. S/S John Weyerhaeuser,* 507 F.2d 68, 73 (2d Cir.1974); *A/S Brovanor v. Cent. Gulf S.S. Corp.,* 323 F.Supp. 1029, 1032–33 (S.D.N.Y.1970). It is a well-settled principle of admiralty law that, absent agreement to the contrary, "the duty to load, stow and discharge cargo and the consequences for failing to do so properly fall upon the ship and her owner." *Nissho–Iwai,* 617 F.2d at 914; *accord Nichimen Co. v. M/V Farland,* 462 F.2d 319, 330 (2d Cir.1972). Since there is no agreement between Novocargo and Senator modifying this common law allocation of duties, Senator bears responsibility for the predischarge damage to the cargo. Therefore, Novocargo is entitled to full indemnity from Senator.

■ Senator, in turn, is entitled to full indemnity from United Arab.[4] Pursuant to

the slot charter agreement, United Arab agreed to indemnify Senator for: (1) liability incurred as a result of improper "stowage, lashing and securing of the goods in the containers offered by them for shipment" (Def.Ex. U–M); (2) any "damage to property ... resulting from ... improper stowage of goods within containers" (Def.Ex. U–M); and (3) any damages "arising out of or in connection with the act or omission of [United Arab], or its agent, sub-contractors or employees including but not limited to ... improper stowage of goods in the container" (Def.Ex. S–E).

United Arab asserts that Senator has no claim for indemnity against it because the aircraft tractor was lashed to a flatrack container rather than housed inside a "closed container." (United Arab Post–Trial Mem. at 4.) Therefore, United Arab claims, the aircraft tractor was not "in" or "within" a container for purposes of the slot charter agreement. Further, United Arab argues that it is entitled to indemnity from Senator because Senator was in the best position to avoid the damage caused by the improper aircraft tractor lashing. Finally, United Arab claims that it is not liable under a negligence theory because Casan Colomar was an independent contractor, and was therefore not subject to United Arab's control. United Arab's arguments are unavailing.

---

**3.** Although this Court could have found that Global was instead liable to Senator under the indemnity provisions of the terminal and stevedoring agreement (Def. Ex. S–D ¶ 5.01–03), the better result in this case, considering the direct duty of a stevedore to a shipper, is to employ the provisions of Rule 14(c).

**4.** United Arab argues that Senator never formally exercised its right to assert a cross-claim against it, and therefore should be prevented from recovering on that basis. This Court, however, exercises its broad discretion

to allow Senator to amend its pleadings and assert a cross-claim against United Arab for indemnification. *See Local 802, Associated Musicians of Greater New York v. Parker Meridien Hotel,* 145 F.3d 85, 88 (2d Cir.1998); *Guttman v. Sands,* No. 88 Civ. 5439(JSM), 1990 WL 213082 (S.D.N.Y. Dec 18, 1990). However, this Court notes that by asserting this cross-claim, Senator has thereby forfeited any right to arbitrate the indemnity issue against United Arab. (Tr. at 15.)

Contracts must be interpreted "to give effect to the parties' intent as expressed by the plain language of the provision," *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 58 (2d Cir.2001), and words must be given their reasonable and ordinary meaning. *See Shaw Group Inc. v. Triplefine Intern. Corp.,* 322 F.3d 115, 124–25 (2nd Cir.2003); *Jessica Howard,* 316 F.3d at 169; *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London,* 136 F.3d 82, 86 (2d Cir. 1998). A court may look to a dictionary as an aid in determining a word's reasonable and ordinary meaning. *See, e.g., Jessica Howard,* 316 F.3d at 166 n. 1; *Glyphics Media, Inc. v. M/V CONTI SINGAPORE,* No. 02 Civ. 4398(NRB), 2003 WL 1484145, at *1 n. 3 (S.D.N.Y. Mar 21, 2003); *American Nat. Fire Ins. Co. v. Mirasco, Inc.,* No. 99 Civ. 12405(RWS), 2003 WL 1057501, at *17–18 (S.D.N.Y. Mar 10, 2003).

There is no doubt that a flatrack, while not enclosed, is a "container" according to its "ordinary shipping-contract meaning." *Jessica Howard,* 316 F.3d at 169; *see, e.g., U.S. Fire Ins. Co. v. S/S LIONS GATE BRIDGE,* No. 88 Civ. 9188(MJL) (MHD), 1997 WL 10923, at *4 (S.D.N.Y. Jan. 10, 1997) (defining a flatrack as a type of "container"); *Transatlantic Marine Claims Agency, Inc. v. SS "American Leader",* No. 84 Civ. 8771(MJL), 1986 WL 1191, at *1 (S.D.N.Y. Jan.17, 1986) (same); Joint Publication 1–02, *DOD Dictionary of Military and Associated Terms* (same). The Christiansen Survey, stipulated to by United Arab, refers to the item in question as a "flatrack container." (Stip. ¶ 13; Def. Ex. S–G at 4.)

United Arab asserts that the aircraft tractor was not "in" or "within" the flatrack container because a flatrack container is not fully enclosed. United Arab's proffered interpretation of the operative terms is too narrow. There is nothing in the ordinary meaning of "in" or "within" to so restrict this Court's interpretation of the slot charter agreement. "Within" is defined as "inside the bounds of a place or region." *Webster's Third New International Dictionary of the English Language* 2627 (Unabr.1993); *see also Black's Law Dictionary* 1602 (6th ed.1990) (defining "within" as "[i]nside the limits of"). "In" is similarly defined. *See Webster's Third New International Dictionary of the English Language* 1139 (Unabr.1993) (defining "in" variously as "indicat[ing] location or position in space" and "within the limits of a space"). Nothing in the plain meaning of the words "in" or "within" limit the indemnity provisions of the slot charter agreement solely to cargo shipped in "closed containers." The plain meanings of the terms "within" and "in" clearly contemplate the notion of cargo being lashed within the physical boundaries of an open-topped, open-sided container. *See Finguerra v. S/S Argonaut,* No. 97 Civ. 7266(JSM), 1998 WL 314726, at *5 (S.D.N.Y.1998) ("the parties agree the yacht was stowed on deck *in* a 'flatrack'") (emphasis added); Joint Publication 1–02, *DOD Dictionary of Military and Associated Terms.*

Further, reading the slot charter agreement as a whole reveals that it was the intent of the parties that United Arab bear liability for any damage arising from improper or negligent "stowage, lashing and securing" of its cargo, even if it was performed by United Arab's "agent, sub-contractors or employees." (Def.Exs.S–E, U–M.) Since the parties' intent and the plain meaning of the slot charter agreement are both consistent with United Arab's acceptance of liability for improper stowage and lashing of its cargo, including cargo lashed to flatrack containers, Senator is entitled to indemnity from United Arab. As the indemnity provisions of the slot charter

agreement conclusively resolve liability between Senator and United Arab, it is not necessary for this Court to consider the balance of United Arab's arguments.[5]

### IV. *Damages*

Now that percentages of liability have been allocated among the defendants, this Court must determine the quantum of plaintiffs' damages. Plaintiffs argue that their damages should be measured in terms of the resale value of Viva's cargo in the wholesale furniture market, whereas defendants argue that replacement cost of the cargo is the proper measure.

■ In admiralty, it is well-settled that "the general measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value of the goods in the condition in which they actually did arrive." *Sogem–Afrimet, Inc. v. M/V Ikan Selayang,* 951 F.Supp. 429, 443–44 (S.D.N.Y.1996) (quotation omitted); *accord Jessica Howard,* 316 F.3d at 169; *Kanematsu–Gosho Ltd. v. M/T Messiniaki Aigli,* 814 F.2d 115, 118 (2d Cir.1987); *Valerina Fashions, Inc. v. Hellman Intern. Forwarders, Inc.,* 897 F.Supp. 138, 140 (S.D.N.Y.1995); *Ins. Co. of North Am. v. S/S Italica,* 567 F.Supp. 59, 62–63 (S.D.N.Y.1983). Where a contract exists to sell the goods at issue, the proper measure of a plaintiff's damage is the price the plaintiff would have received under the contract, minus any money plaintiff received by selling the damaged goods. *See Sogem–Afrimet,* 951 F.Supp. at 443–44; *Insurance Co. of North Am.,* 567 F.Supp. at 63; *Pacol (Canada) Ltd. v. M/V Minerva,* 523 F.Supp. 579, 582–83 (S.D.N.Y. 1981).

■ Defendants argue that Viva's resale commitments are not legally enforceable contracts, and that plaintiff's proffered market price damages are too speculative. (Tr. 31–55.) These arguments are unavailing. First, there is sufficient evidence that Viva purchased the furniture at issue to fulfill preexisting resale commitments. (Tr. at 18–31, 55–57; Pl. Exs. 4–5.) Second, even if Viva's resale commitments are not legally enforceable contracts, the combination of plaintiffs' resale commitments and price lists sufficiently establish a market price for the furniture. (Tr. at 21; Pl. Exs. 4–5.) *See Sogem–Afrimet,* 951 F.Supp. at 443–44 ("an actual contract for resale is not even required for the plaintiff to sustain its burden.... [E]ven if the court were to find that the proof of contract ... was lacking, there is still sufficient evidence based on the previously signed contract that the market price for plaintiff's [goods] is what plaintiff claims."); *see also Project Hope,* 250 F.3d at 77 (market price theory of damages is appropriate where a market exists for a product, even if there is no existing contract). Defendants have offered no proof of their own tending to show that plaintiffs' proffered resale prices do not represent the furniture's wholesale market value. *See Valerina Fashions,* 897 F.Supp. at 141 (a plaintiff "need only proffer proof tending to show its loss").

Plaintiffs, therefore, are entitled to receive as damages the resale value of the

---

**5.** With respect to United Arab's third-party claim against Casan Colomar, this Court notes that Casan Colomar has never filed an Answer, United Arab has never made a motion for default judgment, and United Arab failed to mention this third-party claim in either the Joint Pre–Trial Order or at trial. Therefore, this Court deems United Arab's third-party cause of action against Casan Colomar to be abandoned, and it is dismissed with prejudice.

damaged furniture in the wholesale market, as well as incidental expenses and survey fees. *See Sogem–Afrimet,* 951 F.Supp. at 443–44; *Insurance Co. of North Am.,* 567 F.Supp. at 63. Under this market price theory, plaintiffs overall damages total $47,011.93, calculated as follows:

| | |
|---|---|
| Resale value of furniture | $46,935.00 |
| Incidental Expenses | 1,470.00 |
| Survey Fees | 1,303.03 |
| Less items accepted as sound | (1,196.10) |
| Less salvage proceeds | (1,500.00) |
| TOTAL | $47,011.93 |

(Stip. ¶ 19, 20; Tr. at 25, 27–30, 60; Pl. Exs. 5, 7, 16–17.) Of this total, $34,875.07 is due to Hartford based on its payment of Viva's insurance claim in the amount of $33,572.04 and survey fees in the amount of $1,303.03. (Stip. ¶ 17; Tr. at 30; Pl. Exs. 14–17.) The balance, $12,136.86, is due to Viva.

Since pre-discharge damage accounted for 57% of the total damage to the cargo, Novocargo and Senator are jointly and severally liable to plaintiffs for $26,796.80. Post-discharge damage accounted for 43% of the total damage, and therefore Global is liable to plaintiffs for $20,215.13. Any recovery, of course, implicates this Court's findings concerning indemnity among certain defendants. *See supra* Section III.

Plaintiffs are also entitled to pre-judgment interest. *See, e.g., Jones v. Spentonbush–Red Star Co.,* 155 F.3d 587, 593 (2d Cir.1998); *Mentor Ins. Co. v. Brannkasse,* 996 F.2d 506, 520 (2d Cir.1993). In the Second Circuit, the rate of interest used in awarding pre-judgment interest is within the court's discretion. *See, e.g., Mentor Ins. Co.,* 996 F.2d at 520; *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 311 (2d Cir.1987). However, the rate of interest awarded should be sufficient to make the plaintiff whole. *See, e.g., McCrann v. United States Lines, Inc.,* 803 F.2d 771, 774 (2d Cir.1986); *Indep. Bulk Transp., Inc. v. Vessel "MORANIA ABA-CO",* 676 F.2d 23, 26 (2d Cir.1982); *Zim Israel Navigation Co. v. 3–D Imports, Inc.,* 29 F.Supp.2d 186, 193 (S.D.N.Y.1998).

While the interest rate is discretionary, most courts in this Circuit have found an appropriate rate to be the average interest rate paid on United States Treasury Bills over either a six or twelve-month period. *Compare McCrann,* 803 F.2d at 774 (approving award of pre-judgment interest in admiralty case based on six-month Treasury bill rates) *with Turecamo Maritime, Inc. v. Weeks Dredge No. 516,* 872 F.Supp. 1215, 1235 (S.D.N.Y.1994) (approving award of pre-judgment interest in admiralty case based on twelve-month Treasury bill rates). Accordingly, this Court orders that for the period from the date of discharge of the cargo at issue until judgment, interest shall be calculated based on the average interest rate paid on six-month United States Treasury Bills.

## CONCLUSION

For the reasons set forth above, this Court finds: (1) Novocargo USA Inc. and Senator Lines GmbH are jointly and severally liable to plaintiffs for pre-discharge damage in the amount of $26,796.80 plus interest; (2) Global Terminal & Container Services, Inc. is liable to plaintiffs for post-discharge damage in the amount of $20,215.13 plus interest; (3) Novocargo is entitled to full indemnity from Senator; and (4) Senator is entitled to full indemnity from United Arab Shipping Co. The foregoing shall constitute this Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. The Clerk is directed to enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.